420 A.2d 1090

Max A. HANKIN and Janet Hankin, Appellants,

v.

Moe Henry HANKIN and Sabina Hankin, Gertrude Hankin, Perch P. Hankin, Samuel Hankin and Harriet Hankin, Benjamin R. Shanken and Pauline Shanken and Pan American Associates.

Max A. HANKIN and Janet Hankin,

v.

Moe Henry HANKIN and Sabina Hankin, Gertrude Hankin, Perch P. Hankin, Samuel Hankin and Harriet Hankin, Benjamin R. Shanken and Pauline Shanken and Pan American Associates.

Appeal of Samuel HANKIN and Harriet Hankin.

Superior Court of Pennsylvania.

Argued Sept. 12, 1979.

Filed June 6, 1980.

Petition for Allowance of Appeal Sept. 25, 1980.

Franklin Poul, Philadelphia, for Max A. Hankin and Janet Hankin, appellants.

Thomas Allen, Philadelphia, for Moe Henry Hankin, Sabina Hankin, Perch P. Hankin, Gertrude Hankin, Benjamin R. Shanken and Pauline Shanken, appellees.

Thomas A. Masterson, Philadelphia, for Samuel Hankin, M.D., and Harriet Hankin, appellants.

Robert S. Ryan, Philadelphia, for Pan American Associates, appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

SPAETH, Judge:

These are consolidated appeals from an order dismissing exceptions to the chancellor's adjudication and decree nisi, entered in appellants' actions in equity against appellees.[1]

---

1. In Appeal No. 1244 the appellants are Max and Janet Hankin, the appellees, Moe, Sabina, Perch, Gertrude, Samuel, and Harriet Hankin, and Benjamin and Pauline Shanken. In Appeal No. 1262 the appellants are Samuel and Harriet Hankin, the appellees, Moe, Sabina, Perch, and Gertrude Hankin, and Benjamin and Pauline Shanken. While named as defendants below, and listed as appellees in Appeal No. 1244, Samuel and Harriet Hankin were more active below as plaintiffs than as defendants and are more active on this appeal as appellants than as appellees. Indeed, Max and Janet Hankin have

The parties are all [2] members of the Hankin Family Partnership,[3] and on this appeal appellants argue that the lower court erred in refusing to grant certain equitable relief,[4] including the court's refusal to appoint a receiver to take charge of the liquidation of the partnership assets, and to enjoin a sale of certain partnership property known as Willow Grove Park to the intervenor defendant Pan American Associates.[5]

Moe, Perch, Max, and Samuel Hankin are brothers and Pauline Hankin Shanken is their sister. They and their spouses represent the five branches of the Hankin family and are equal partners in the Hankin Family Partnership and all the entities and enterprises owned and operated by the partnership. There has never been a written partnership agreement among the members of the Hankin Family

not filed a brief on these appeals but have instead, for the most part, see note 5 infra, joined in the brief filed by Samuel and Harriet Hankin. Accordingly, in this opinion the term "appellants", unless otherwise specified, will refer to Max, Janet, Samuel, and Harriet Hankin, and the term "appellees" to Moe, Sabina, Perch, and Gertrude Hankin and Benjamin and Pauline Shanken. Pan American Associates intervened as a defendant in the action below and is also an appellee on this appeal.

2. Except for the intervenor defendant Pan American Associates.

3. The partnership has also been referred to as the Hankin Enterprises, or the Hankin Family Enterprises, but in this opinion it will be referred to as the Hankin Family Partnership. See Chancellor's Finding of Fact No. 1.

4. Besides the appointment of a receiver and the prevention of the sale of Willow Grove Park to Pan American Associates, see infra, Samuel and Harriet Hankin request a distribution in kind of the partnership assets, disqualification of the family law firm, reinstatement in the partnership employ of their children, a prohibition against reinvestment of any proceeds from any sales of partnership assets, and a prohibition against the use of any partnership assets to bestow any disproportionate benefits on appellees. See discussion infra.

5. While Max and Janet Hankin join in the argument for the appointment of a receiver, and to an unclear extent in Samuel and Harriet Hankin's other claims, see note 1 supra, they do not raise any objection to the sale of Willow Grove Park to Pan American Associates.

Partnership. The partnership assets include the ownership and operation of seven motor lodges, the Willow Grove bowling alley and shopping center, the Valley Forge and Hidden Springs golf courses, an industrial park, and various tracts of real estate including the Willow Grove Park. The total assets of the partnership are presently worth over $72 million, with total liabilities of about $11 million. Some of the assets are held by corporations.[6] The shares of each of these corporations are also owned by the partners equally, and each corporation is held and operated for the benefit of the entire partnership.[7] Formal corporate procedures are generally not followed and profits from the corporations are not distributed as dividends but are intermingled in a single bank account entitled Hankin & Hankin Trustees, while various expenses are apportioned to the various entities as a matter of custom or according to which unit is able to afford payment. Besides certain fringe benefits, such as free meals and the use of automobiles, each of the five branches of the Hankin Family receives an equal draw from the Hankin & Hankin Trustees account. The present draw is $40,000 per year. In addition, the partnership has paid the federal and state personal income taxes of the partners, charging these income payments to the partners' capital accounts. There also was a practice of hiring the children and spouses of the children of the partners at a uniform rate of $26,000 per year.[8]

6. The corporations are the Minamayor Corporation, George Washington Motor Lodge of Allentown, Inc., Lancer, Inc., Hankin Realty Corporation, and Betmar Corporation. Lancer and Betmar are dormant.

7. The corporations were formed primarily to realize tax benefits.

8. Prior to 1977, the payrolls of the various enterprises operated by the Hankin Family Partnership included Myron Hankin and Minna Hankin Mintz, the son and daughter of Max and Janet Hankin; Mitchell Hankin and Nancy Schwartzman, the son and daughter of Samuel and Harriet Hankin; George Hankin, the son of Perch and Gertrude Hankin; and Louis Schiffman, the son–in–law of Moe and Sabina Hankin. The partnership also paid an annual retainer of $26,000 to the law firm of Hankin, Hankin & Hankin, for the benefit of Lowen Hankin, the son of Moe and Sabina Hankin. *See* Chancellor's Finding of Fact No. 28.

For approximately twenty years Moe, Perch, and Samuel Hankin, and Benjamin Shanken maintained their offices in one large room on the second floor of the Professional Center Building in the Willow Grove Shopping Center. The files pertaining to the Hankin Family Partnership were kept in this room. Also in this room were the offices of the law firm of Hankin, Hankin & Hankin, and of its predecessor, Hankin, Hankin & Shanken. The firm represented the partnership in most of its legal affairs, and the partnership and its enterprises and the two banks controlled by the partnership have been the principal clients of the firm.

Relations between the parties began to deteriorate in 1975, when there was a conflict over the control of the directorships of one of the banks controlled by the family. This conflict erupted into open warfare in 1977, when appellees, primarily Moe and Perch Hankin, engaged in a course of conduct apparently aimed at freezing appellants out of the business.[9] Max Hankin, who had earlier requested a dissolution and liquidation of the partnership in 1967, again became disenchanted with the way the business was proceeding and as a consequence initiated the present litigation. On June 1, 1977, Max and Janet Hankin, through their attorney, formally demanded a dissolution of the partnership, and on August 19, 1977, they filed a complaint in equity seeking dissolution, liquidation, appointment of a receiver, an accounting, and other equitable relief. Appellees filed an answer to the complaint. Samuel and Harriet Hankin, who were also named as defendants,[10] also filed an answer to the complaint, and in addition filed a crossclaim against appellees and a petition, seeking dissolution, liquidation, appointment of a receiver, an accounting and other equitable relief. On October 21, 1977, appellees filed preliminary objections and an answer to the crossclaim, and also a counterpetition for a preliminary injunction to enjoin all appellants from interfering with the partnership business.

**9.** This conduct included the partitioning of the office and the firing of the children, as described in the chancellor's Findings of Fact Nos. 30, 33, 34 and 38 *infra.*

**10.** *See* note 1 *supra.*

Meanwhile, in an apparent attempt to liquidate the assets of the partnership, appellees negotiated an agreement with Pan American Associates for the purchase of Willow Grove Park. Appellees and Max and Janet Hankin [11] signed the agreement with Pan American Associates but Samuel and Harriet Hankin refused.

The case proceeded to discovery. On June 29, 1978, Max and Janet Hankin filed a new petition for the appointment of a receiver. On July 6, 1978, a hearing was held and September 11 was tentatively scheduled as the day on which hearings on all the petitions would begin. On September 11, Samuel and Harriet Hankin filed an amended petition in which they repeated their request for the appointment of a receiver, and additionally requested that the court enjoin the sale of Willow Grove Park to Pan American Associates. As mentioned, neither Samuel nor Harriet Hankin had signed the agreement with Pan American Associates. Moreover, Samuel had been in contact with another buyer for the property, the Taubman Company, which he alleged wished to purchase not only Willow Grove Park but all of the partnership properties. Hearings on the various petitions were held on September 12, October 4, 5, 6, 30, and 31, and November 1 and 2, 1978.

On December 14, 1978, Pan American Associates filed a petition to intervene as a party defendant. The petition was granted and Pan American Associates filed a counterpetition seeking specific performance and an order enjoining Samuel and Harriet Hankin from interfering with the sale of Willow Grove Park. Further hearings were held on January 31 and February 1, 2, 5, 6 and 8, 1979.

After all the hearings had been completed, the parties submitted proposed findings of fact and conclusions of law. On April 2, 1979, the chancellor, Judge Louis STEFAN, issued an adjudication containing findings of fact and conclusions of law, and a decree nisi. Exceptions were filed by

11. *See* note 5 *supra.*

appellants, and after argument before the court en banc[12] the exceptions were dismissed. This appeal followed.[13]

The chancellor's findings of fact in support of the adjudication and decree nisi are extensive and careful. The most pertinent of these findings are as follows:

17. As among the parties to this case, Moe and Perch Hankin have contributed the most, by way of productive effort and valuable business judgment, in the acquisition, development, and management of the Hankin businesses and properties with which this litigation is concerned.

\* \* \* \* \* \*

20. Until recently, . . . Samuel Hankin, M.D. along with his brothers, was active in the day–to–day operation of the Hankin Family Partnership. . . .

21. Dr. Hankin acted as the general contractor and representative of the family partnership on the job sites in connection with the construction of various motor lodges owned by the family, including but not limited to the George Washington Motor Lodges located in King of Prussia and Allentown. He was on the project site each day during the construction of these motor lodges, acting as the general

---

12. The court en banc consisted of President Judge LOWE, Judge STEFAN, and Judge CIRILLO.

13. The jurisdiction of this court over the present appeals is based upon the Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S. § 742 (Purdon's Pamphlet 1979), which provides:

> The Superior Court shall have exclusive appellate jurisdiction of all appeals from final orders of the courts of common pleas, regardless of the nature of the controversy or the amount involved, except such classes of appeals as are by any provision of this chapter within the exclusive jurisdiction of the Supreme Court or the Commonwealth Court.

42 Pa.C.S. § 742.

The appeals are taken from the order of the lower court dismissing appellants' exceptions to the adjudication and decree nisi. The right of appeal in cases such as the present one lies not from the decree nisi of the chancellor but from the order and final decree of the court. See Bogosian v. Foerderer Tract Committee, 264 Pa.Super. 84, 88, 399 A.2d 408, 410 (1979), citing, Patrick & Wilkins Co. v. Adams, 456 Pa. 566, 322 A.2d 341 (1974).

contractor and coordinating the activities of the various subcontractors.

\* \* \* \* \* \*

24. Over the years, both Moe and Perch Hankin frequently signed other owners' names (including those of Max, Janet, Samuel and Harriet Hankin) to various legal documents, with said other owners' foreknowledge and authorization.

\* \* \* \* \* \*

29. Since 1977, the actual operation of the partnership has been entirely in the control of a majority group of partners consisting of Moe and Sabina Hankin, Perch and Gertrude Hankin, and Benjamin and Pauline Shanken. The control has normally been exercised by or through Moe or Perch Hankin.

30. In 1977, the majority group discharged [or forced out the children of Samuel and Max Hankin].

\* \* \* \* \* \*

33. The disputes within the family partnership reached full blood in April, 1977, when Perch Hankin, his son Mark and son–in–law Robert Nappen, erected partitions in the large room which the four partners had shared as their offices for nearly twenty years.

34. These partitions were erected surreptitiously over a weekend, and without prior consultation with Samuel Hankin.

\* \* \* \* \* \*

38. The effect of the partitioning has been to deny Samuel Hankin access to the files and records of the Hankin Family Partnership.

\* \* \* \* \* \*

40. Since the family split, James Connor, the controller of the family enterprises, has been taking his instructions from Moe and Perch, and his contacts with Samuel have declined as the family problems increased.

41. Until October 5, 1978, Moe Henry Hankin and Perch P. Hankin refused to cause the family partnership to pay the

1977 federal and state income taxes for the individual partners or to pay the 1978 quarterly estimated federal and state income tax payments for the partners, as had been the custom of the partnership in the past, unless: (a) Samuel and Harriet Hankin agreed to sign the option for the sale of Willow Grove Park to Ronald Rubin; and (b) Max and Janet Hankin agreed to a restatement of their capital accounts.[14]

\* \* \* \* \* \*

43. Since the inception of this litigation, the pace of liquidation activities, on the part of the majority Hankins, has intensified.

\* \* \* \* \* \*

46. With respect to Willow Grove Park which is listed ... as having a value of $7.35 million, the documents ... and the testimony ... indicate that as of approximately February 1, 1979, there exist two Agreements to sell approximately 85 acres in Willow Grove Park to Pan American Associates for approximately $7,650,000 which Agreements have been signed by all owners except Samuel and Harriet Hankin, and which Agreements have been delivered to and acted upon by the buyer Pan American Associates.

47. On May 15, 1978, Pan American Associates exercised its option pursuant to the Option Agreement dated November 15, 1977, with respect to 75 acres in Willow Grove Park.

48. Irrespective of its relevance, the evidence indicates that at the time of the majority Hankins' execution of the Option Agreement dated November 15, 1977, to sell 75 acres in Willow Grove Park to Pan American Associates, the majority Hankins had no reason to believe, or belief in fact, that Samuel and/or Harriet Hankin would not sign said agreement.

[49 through 58 concern the appraisals of the Willow Grove Park property. *See* note 38 *infra*.]

59. The Court finds that the sale of Willow Grove Park to Pan American Associates pursuant to the two existing

14. Ronald Rubin is a partner of the Richard I. Rubin & Company general partnership, which is the general partner of Pan American Associates, a limited partnership.

Agreements is a sale well calculated to advance the liquidation, and should go forward for that reason.

60. The sale of Willow Grove Park to Pan American Associates for the use intended by Pan American Associates–a regional mall–is not only a good sale in itself, but also will probably have the effect of increasing the liquidation price of other Hankin properties (such as the Willow Grove Shopping Center) located near Willow Grove Park.

\* \* \* \* \* \*

69. Although undeniably slow in starting, nonetheless, under the pressure of the within action, the majority Hankins seem presently to be carrying out a program of liquidating the Hankin properties not already subject to Agreement of Option and/or Sale, at good prices, and within a reasonable time.

70. With the exception of the Willow Grove Shopping Center ... [see 81 infra] the major unsold properties in the Hankin portfolio are at present the subject of active efforts to sell by the majority Hankins.

[71 through 80 describe the liquidation efforts with respect to the rest of the Hankin portfolio]

81. Although they have considered various offers that have been made, the majority Hankins have delayed active efforts to sell the Willow Grove Shopping Center, and other rental properties situated near Willow Grove Park, for the sensible reason that the Hankins realistically can expect a higher price for these properties after the ground–breaking for the proposed mall at Willow Grove Park, which is scheduled for the spring of 1979.

82. Based on Moe Hankin's knowledge and experience in real estate dealings generally, his intimate familiarity with the Hankin properties before the Court, and his liquidation program ... and the testimony relating thereto, the Court accepts as a reasonable prediction Moe Hankin's testimony ... that given cooperation on the part of the minority Hankins, Moe Hankin will be able to liquidate the bulk of the unsold Hankin assets within one year.

83. If the Hankin properties were put up for a quick sale, the sale proceeds would be considerably less than if a reasonable time is allowed in which to liquidate the properties.

84. The evidence before the Court as to the parties' income and other benefits from the businesses, as well as their income from other sources, indicates to the Court that it is improbable that any of the parties will suffer undue economic harm, pending liquidation, if a reasonable time is allowed in which to attempt to liquidate the various properties at reasonably good prices.

85. Based on the testimony of Moe and Perch Hankin, the Court finds that they are the most suitable persons to conduct the liquidation of the Hankin properties.

86. If a receiver were appointed in this action to conduct the liquidation, the probable result would be that prospective purchasers would expect bargain prices and that the proceeds received in liquidation would suffer as a result.

87. It is the majority Hankins' general intent to use the first substantial proceeds of liquidation to pay the debts of the businesses.

88. [Appellants] have not presented in this action any evidence, even taken as true, which would constitute substantial waste of the parties' assets.

89. Pending liquidation, the Hankin properties which are income–producing are being competently managed by Moe and Perch Hankin (partly through James Connor, whose testimony convinces the Court that he is an able and conscientious manager of said properties).

[90 and 91 discuss strength of the business and their management]

92. Based in part on the correspondence contained in Exhibits D–13A through D–13R, and on the lack of substantial evidence to the contrary, the Court finds that the majority Hankins have kept Samuel and Max Hankin and/or their counsel reasonably well informed as to the liquidation of Hankin properties, and as to any negotiations and other activities in connection therewith.

93. Pending liquidation, the majority Hankins have kept Max and Samuel Hankin and/or their counsel reasonably well–informed as to important matters affecting the businesses.

94. There is no evidence of any current problem with respect to taxes, nor of any intention, on the part of the majority Hankins, other than that the individual owners' taxes will be paid by the businesses, as customary in the past.

95. The Taubman Company and/or its affiliates were first identified to the majority Hankins as a prospective purchaser of the entire portfolio of Hankin assets, including Willow Grove Park, in August of 1978, i. e., well after the majority Hankins' execution and delivery of the two Agreements to sell approximately 85 acres in Willow Grove Park to Pan American Associates.

96. When first informed of the interest of the Taubman Company and/or its affiliates in acquiring the Hankin assets, in August of 1978, the majority Hankins acted promptly and in good faith, in requesting a meeting with the prospective purchaser to discuss the possible sale of Hankin assets not then already subject to agreement of sale.

97. In informing counsel for the Taubman Company, via P–22, that the Willow Grove Park property was already subject to agreement of sale and was therefore not available for sale to the Taubman Company and/or its affiliates, the majority Hankins were acting properly and in good faith.

98. Portions of the deposition testimony of Shire Rothbart, a representative of the Taubman Company and/or its affiliates, were read into evidence . . . . While it is apparent from this testimony that the Taubman Company and/or its affiliates have given some consideration to acquisition of some or all Hankin properties, Mr. Rothbart refused to testify specifically as to the value(s) placed by Taubman on any Hankin assets . . ., and refused to produce documents bearing on such valuation. . . . Thus, the Court finds itself without sufficient information, based upon Mr. Rothbart's

testimony, to know or to make a finding as to the amount of any offer which may hereafter be made, for any Hankin property under any set of circumstances, by the Taubman Company and/or its affiliates.

On the basis of these findings of fact, the chancellor ruled that the partnership had been dissolved and was being liquidated, that appointment of a receiver was not necessary, that liquidation of the assets should continue under appellees with supervision by the court, and that the agreements to sell Willow Grove Park to Pan American Associates were in the best interests of all the partners and would be enforced.

In their exceptions filed below and in their brief on this appeal, appellants have attacked certain of the chancellor's findings of fact,[15] and have argued that their own interpretation of the evidence should be adopted by this court.[16] It is settled, however, that "the findings of fact of the [c]hancellor who heard the testimony without a jury, approved by the court en banc, are entitled to the weight of a jury's verdict; that such findings are controlling and that the court's decree should not be reversed unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." *Barbet v. Ostovar*, 273 Pa.Super. 256, 260, 417 A.2d 636, 638 (1979), *quoting Bogosian v. Foerderer Tract Committee*, 264 Pa.Super. 84, 89, 399 A.2d 408, 411 (1979); *Chatham Communications, Inc. v. General Press Corp.*, 463 Pa. 292, 297, 344 A.2d 837, 840

---

**15.** Altogether appellants filed exceptions below to the chancellor's Findings of Fact Nos. 17, 18, 43, 59, 60, 61, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 91, 92, 93, 95, 96, 97, and 98. Moreover, in their brief filed on this appeal appellants attempt to take exception to Finding of Fact No. 24. *See* Appellants' Brief at p. 17 n. 4. The proper time and place for this exception was after the decree nisi in the court below and not on this appeal. In any event the exception to Finding of Fact No. 24 would have been dismissed, for the testimony fully supports the finding. *See* N.T., October 5, 1978, at 222, and N.T., February 2, 1979, at 339–40.

**16.** Indeed, appellants' arguments concerning the facts are so extensive that they pervade even the statement of the case in their brief. *See* Pa.R.A.P. 2116(b).

(1975).[17] The chancellor's findings are especially binding where they are based upon the credibility of the witnesses. *See Herwood v. Herwood*, 461 Pa. 322, 336 A.2d 306 (1975); *Charles v. Henry*, 460 Pa. 673, 334 A.2d 289 (1975); *Scientific Living, Inc. v. Hohensee*, 440 Pa. 280, 270 A.2d 216 (1970); *Law v. Mackie*, 373 Pa. 212, 95 A.2d 656 (1953).

▮▮▮ In reviewing the chancellor's findings in this case we note that several were not so much findings of fact as inferences or deductions from the evidence. This may be said, for example, of Findings of Fact Nos. 17, 43, 59, 69, 70, 85, 86, 88 and 97. It is established that "[w]hen a finding of fact is simply a deduction from other facts and the ultimate fact in question is purely a result of reasoning, the appellate court may draw its own inferences and arrive at its conclusions from the facts as established." *In the Matter of the Estate of Alice D. McKinley*, 461 Pa. 731, 734 n. 1, 337 A.2d 851, 853 n. 1 (1975), *citing, Publicker Estate*, 385 Pa. 403, 410, 123 A.2d 655, 660 (1956), *Dorrance's Estate*, 309 Pa. 151, 156, 163 A. 303, 304 (1932).[18] With respect to these findings, therefore, we shall make our own deductions and draw our own conclusions as may be necessary to a proper resolution of the legal questions presented. As to the other findings,

17. *Accord, Curtis v. Redevelopment Authority of the City of Philadelphia*, 482 Pa. 58, 393 A.2d 377 (1978); *Aiken Indus., Inc. v. Estate of Wilson*, 477 Pa. 34, 383 A.2d 808 (1978); *Brentwater Homes, Inc. v. Weibly*, 471 Pa. 17, 369 A.2d 1172 (1977); *Payne v. Kassab*, 468 Pa. 226, 361 A.2d 263 (1976); *Weyandt v. Restaneo*, 461 Pa. 245, 336 A.2d 268 (1975); *Cowen v. Krasas*, 438 Pa. 171, 264 A.2d 628 (1970); *Yuhas v. Schmidt*, 434 Pa. 447, 258 A.2d 616 (1969); *Lanning Will*, 414 Pa. 313, 200 A.2d 392 (1964); *Brown v. Gresh*, 402 Pa. 35, 165 A.2d 629 (1960); *Sterrett v. Sterrett*, 401 Pa. 583, 166 A.2d 1 (1960).

18. *Accord, In Re Thomas Estate*, 463 Pa. 284, 344 A.2d 834 (1975); *Adler v. Montefiore Hospital Association of Western Pennsylvania*, 453 Pa. 60, 311 A.2d 634 (1973); *Kemp v. Majestic Amusement Co.*, 427 Pa. 429, 234 A.2d 846 (1967); *Keyser v. Margolis*, 422 Pa. 553, 223 A.2d 13 (1966); *Coffin v. Old Orchard Development Corp.*, 408 Pa. 487, 186 A.2d 906 (1962); *Shydlinski v. Vogt*, 406 Pa. 534, 179 A.2d 240 (1962); *Chambers v. Chambers*, 406 Pa. 50, 176 A.2d 673 (1962); *Sechler v. Sechler*, 403 Pa. 1, 169 A.2d 78 (1961); *Commonwealth Trust Co. v. Szabo*, 391 Pa. 272, 138 A.2d 85 (1957); *Philadelphia Fresh Food Terminal Corp. v. M. Levin & Co.*, 239 Pa.Super. 287, 361 A.2d 886 (1976).

which are not merely the chancellor's deductions or conclusions from the evidence, we have examined the record and have concluded that they are fully supported by the testimony and documents introduced below.[19] Therefore, with re-

19. We shall not detail here the evidentiary basis for each of the findings to which appellants filed a specific exception but instead refer appellants to the record below, especially those portions specifically cited by the chancellor in support of his adjudication. We do note, however, that some further explanation is in order with respect to the exceptions filed by appellants to Findings of Fact Nos. 48 and 98.

In contending that Finding of Fact No. 48 is not supported by the evidence, appellants specifically point out that Samuel and Harriet Hankin, through their counsel, had written a letter to Moe and Perch Hankin on October 11, 1977, in which they revoked all powers of attorney and all other oral or written grants of authority that they had given Moe and Perch. This letter was introduced in evidence, and based upon it, appellants argue that since Moe Hankin received the letter before the agreement with Pan American Associates was signed, he was thus informed beforehand that neither Samuel nor Harriet Hankin would sign the agreement. This argument is without merit. The letter at most indicated that neither Samuel nor Harriet Hankin thereafter wished to be bound by Moe or Perch's signatures; it did not necessarily indicate that they themselves would refuse to sign the agreement with Pan American Associates.

With respect to Finding of Fact No. 98, appellants apparently take no exception to that portion where the chancellor detailed his view of Shire Rothbart's testimony. They do except, however, to the chancellor's statement that "the Court finds itself without sufficient information, based upon Mr. Rothbart's testimony, to know or to make a finding as to the amount of any offer which may hereafter be made, for any Hankin property, under any set of circumstances, by the Taubman Company and/or its affiliates."

Appellants argue that Shire Rothbart testified in his deposition of October 11, 1978, that the range of values discussed by Samuel Hankin for the entire Hankin family portfolio was between five and eight million dollars per one fifth interest. Deposition, October 11, 1978, at 69, N.T., November 1, 1978, at 391. While it is true that Mr. Rothbart did testify that such a range of values was discussed, nevertheless, the chancellor's finding is not contradicted by this testimony. In his finding, the chancellor merely noted that Mr. Rothbart had refused to testify as to any specific value the Taubman Company placed on any specific Hankin Family asset. The general discussion of five to eight million dollars per share of the entire Hankin Family Partnership portfolio did not, as the chancellor recognized, provide an adequate basis for determining the value the Taubman Company placed on any specific property in the portfolio.

Appellants also argue that notwithstanding Mr. Rothbart's refusal to make a specific statement, but for the fact that he sustained appellees' objections to certain testimony offered by Samuel Hankin,

spect to these findings we conclude that the exceptions filed by appellants were properly dismissed and that the facts as

the chancellor could have received evidence of the values the Taubman Company placed on the assets from that source. In support of this argument appellants refer to the following portions of the record:

Q. All right. To your knowledge, are the Taubman Enterprises still interested in acquiring the entire portfolio?

A. They called me this week, they called the beginning of this week.

MR. FLOWERS: Objection as to anything that was said—we would be glad to have Mr. Taubman here to testify.

THE COURT: Sustained.

 \* \* \* \* \* \*

Q. Has the Taubman Enterprises kept in constant touch with you during the course of this litigation?

A. Yes, they have.

Q. Have you discussed with members of the Taubman organization, that organization paying more for Willow Grove than is currently offered in the option?

MR. FLOWERS: Objection, Your Honor.

THE COURT: Sustained.

 \* \* \* \* \* \*

[Dr. Samuel Hankin on cross–examination]–and they would have given more, Taubman–they offered a million dollars more.

MR. FLOWERS: Excuse me–I would move to strike that answer as being non–responsive, Your Honor.

THE COURT: It is stricken.

N.T. February 8, 1979, at 272–73, 275, 292.

Appellants do not contend that the last answer was responsive and thus that statement will not be considered. They do contend, however, that the prior statements were not hearsay and therefore should have been admitted. In support of this contention appellants first argue that the testimony offered by Dr. Hankin was not hearsay because it was not offered for the truth that the Taubman Company offered some specific amount, but instead was offered "to prove the reasonableness of Dr. Hankin's refusal to sign the Agreement with Pan American Associates." Appellants' Brief at p. 24. This explanation of the evidence should have been, but was not, offered to the court below when the objection was made. In any event the explanation is without merit. Indeed, by arguing now on appeal that the chancellor should have relied on this testimony by Dr. Hankin to make a specific finding as to the amount the Taubman Company offered, appellants are arguing that the chancellor should have considered this testimony for the truth of the matter asserted, i. e., the amount that the Taubman Company offered. Appellant's further argument, that the testimony should have been admitted because other unspecified hersay testimony by appellees was admitted, is also without merit. If appellants had any objection to hearsay testimony by Moe or Perch Hankin, they should have made the objection below at the time that that alleged hearsay was offered in evidence.

found by the chancellor have the weight of a jury verdict on these appeals.

Finally, and by way of concluding this general discussion of the facts of this case, we note that given the sheer volume of the testimony and documents presented below, there are necessarily certain matters in the record that appellants argue are pertinent to their legal claims but as to which the chancellor made no specific findings.[20] We shall discuss some of these matters and offer conclusions with respect to them as may be necessary to determine whether appellants are entitled to the relief they seek.

–1–

We shall first consider appellants' argument that the chancellor erred in refusing to appoint a receiver to liquidate the partnership assets.

–A–

■■■ The decision whether to appoint a receiver is vested in the discretion of the lower court. *Northampton National Bank of Easton v. Piscanio*, 475 Pa. 57, 379 A.2d 870 (1977); *McDougall v. Huntingdon & Broad Top R. & C. Co.*, 294 Pa. 108, 143 A. 574 (1928); *Beaumont v. Beaumont*, 166 Pa. 615, 31 A. 336 (1895); *Bogosian v. Foerderer Tract Committee*, 264 Pa.Super. 84, 399 A.2d 408 (1979); *Weissman v. Henkin*, 154 Pa.Super. 12, 34 A.2d 907 (1943). In exercising its discretion the court must proceed cautiously, for "[t]he power to appoint a receiver is a delicate one, which is jealously safe–guarded, and reluctantly exercised." *Tate v. Philadelphia Transportation Co.*, 410 Pa. 490, 500, 190 A.2d 316, 321 (1963). As the Supreme Court stated in *McDougall v. Huntingdon & Broad Top R. & C. Co., supra* :

[C]ourts will not appoint receivers where there is well–founded suspicion it would be followed by serious injustice or injury to the rights of all parties interested. The court,

**20.** We do not mean to indicate that the chancellor was at fault for not making specific findings with respect to these matters. To the contrary, in our opinion, Judge STEFAN did an admirable job in handling the very large record in this case.

before any appointment is made, will act with the utmost caution. Receivers will not be appointed unless the chancellor is convinced the right is free from doubt, the loss irreparable, with no adequate legal remedy, and the relief sought is necessary.

*Id.* 294 Pa. at 118, 143 A. at 578.

*See Northampton National Bank of Easton v. Piscanio, supra; Waddell v. Schriber,* 465 Pa. 20, 348 A.2d 96 (1975); *Credit Alliance Corp. v. Philadelphia Minit-Man Car Wash Corp.,* 450 Pa. 367, 301 A.2d 816 (1973).

Recognizing the drastic effect that appointment of a receiver will have on the business entity involved,[21] the court will only impose the remedy where it is necessary to prevent the waste or dissipation of assets, as may be so, for example, where there is fraud or mismanagement. *Northampton National Bank of Easton v. Piscanio, supra; Waddell v. Schriber, supra. See Mintzer v. Arthur L. Wright & Co., Inc.,* 263 F.2d 823 (3d Cir. 1959); *Miller v. Fisco, Inc.,* 376 F.Supp. 468 (E.D.Pa.1974). Thus, in exercising its discretion the court should consider the benefits to be gained and weigh them against the injury that will be sustained by the appointment of a receiver, and only make the appointment if necessary and if the benefits will clearly outweigh the injury. *Northampton National Bank of Easton v. Piscanio, supra. See Albrecht v. Diamon,* 125 Minn. 283, 146 N.W. 1101 (1914); *Eisenberg v. Eisenberg,* 2 Pa.D. & C.3d 357 (Phila.1976) (appointment of receiver would be wasteful). "[A] receivership will not be granted where it will work irreparable injury to the rights and interests of others

**21.** In *Northampton National Bank of Easton v. Piscanio, supra,* the Supreme Court stated:

" 'There is nothing, however, which affects a corporation with such serious consequences as does the appointment of a receiver; it is a severe, and may be termed an heroic, remedy, and the conditions that call it into action should be such as would, if persisted in, ordinarily be fatal to corporate life. *The appointment is a distress signal, and is immediately followed by a lowering of financial credit and a general readjustment.*' " *Id.* 475 Pa. at 63, 379 A.2d at 873, *quoting McDougall v. Huntingdon & Broad Top R. & C. Co., supra* 294 Pa. at 117, 143 A. at 578 (emphasis supplied by the Court).

and greater injury will probably result from the appointment than if none were made, or where the appointment will do no good." *McDougall v. Huntingdon & Broad Top R. & C. Co., supra* 294 Pa. at 118, 143 A. at 578.

In an action for the dissolution of a partnership, some early cases apparently held that a receiver will be appointed as "a matter of course." *See* Annotation, 23 A.L.R.2d 583, 597–98 (1952); Clark on Receivers, Volume 3, § 914(b), pp. 1685–86 (3d ed. 1959) ("American Rule"). In this and most other jurisdictions, however, rules similar to those applicable to the appointment of receivers generally have been applied to partnership dissolutions, even in the early cases. *See Fox v. Curtis,* 176 Pa. 52, 34 A. 952 (1896); *Beaumont v. Beaumont, supra; Slemmer's Appeal,* 58 Pa. 168 (1868); *McGlensey v. Cox,* 1 Phila. 387 (1852); *Nathan v. Bacon,* 75 N.J.Eq. 401, 72 A. 359 (1909) (not as matter of course but only when necessary to protect interests of parties); Pomeroy, Equity Jurisprudence, Volume 111, p. 360 (1881). *And see Klass v. Yavitch,* 302 Ill.App. 229, 23 N.E.2d 936 (1939); *Gianakos v. Magiros,* 238 Md. 178, 208 A.2d 718 (1965); *Lust v. Kolpe,* 31 Md.App. 483, 356 A.2d 592 (1976); *Ingram v. Clover Leaf Lumber Co.,* 331 Mo. 739, 55 S.W.2d 295 (1932); *Waddell v. Schriber, supra; Moffett v. Peirce,* 344 Pa. 16, 24 A.2d 448 (1942); *Johnson v. Kunz,* 75 S.D. 22, 58 N.W.2d 227 (1973). Thus it has been held that the decision whether to appoint a receiver in a partnership dissolution is within the discretion of the lower court,[22] and that in deciding whether to grant

22. Section 359 of the Uniform Partnership Act, Act of Dec. 19, 1975, P.L. 524, No. 155, § 1, 59 P.S. § 359 (Purdon's Supp.1979–80), provides:

> Unless otherwise agreed the partners who have not wrongfully dissolved the partnership, or the legal representative of the last surviving partner, not bankrupt, has the right to wind up the partnership affairs; except that any partner, his legal representative, or his assignee, upon cause shown, may obtain winding up by the court.

59 P.S. § 359 (Purdon's Supp.1979–80)

This section, it will be observed, makes no specific provision for the appointment of a receiver, and the power of the court to appoint a receiver in cases arising under this section "stems not from the statute but from the court's equitable powers to appoint a receiver as

the remedy the court should proceed with caution and appoint a receiver only where necessary. *Klass v. Yavitch, supra; Lust v. Kolpe, supra; Nathan v. Bacon, supra; Moffett v. Peirce, supra; Beaumont v. Beaumont, supra.* Among the factors that various courts have considered are the existence of dissension among the partners, dissipation of the partnership assets, fraud or mismanagement by the controlling partners, the denial of the plaintiff partner's rights as a partner, and the balance of necessity and benefits against injury incident to the appointment of a receiver. *See* Annotation, *supra; Yarborough v. Kilbee,* 307 So.2d 223 (Fla.App.1975); *Klass v. Yavitch, supra; Lust v. Kolpe, supra; Waddell v. Schriber, supra; Wrenn v. Wrenn,* 228 S.C. 588, 91 S.E.2d 267 (1956).

–B–

In this case the chancellor admitted both that there was dissension among the partners and that Moe and Perch Hankin had engaged in conduct designed to freeze out Max and Samuel Hankin from participating in the day to day operations of the partnership enterprises.[23] After considering all of the evidence, however, the chancellor also found that Moe and Perch Hankin were the partners best qualified to handle the liquidation, that under their control the liquidation was proceeding properly and promptly, that there was no mismanagement or fraud, that there was no substantial waste, that the minority were informed and protected, and that the injury that would be done by appointing a receiver would outweigh the benefits that would be gained.

an ancillary remedy in an action for another form of relief." *Waddell v. Schriber, supra,* 344 at 32, 348 A.2d at 102, *citing,* Act of March 26, 1915, P.L. 18, part VI, § 37, 59 P.S. § 99 (Purdon's 1964) (statutory predecessor of section 359).

23. The chancellor specifically stated that "[t]he evidence indicates that efforts have been made by the majority to 'freeze out' Max Hankin and Dr. Samuel Hankin. The unfortunate partitioning of the family offices; the removal of Dr. Samuel Hankin as a signatory of checks; the neglect to take any meaningful action in commencing to dispose of assets, after dissolution in 1977; all might well be inferred by Max and Samuel Hankin as manifestations of a cavalier attitude on the part of the majority partners." (R.R. at 54a).

*See* Chancellors Findings of Fact Nos. 17, 43, 69, 70, 85, 86, 88, 91, 92, 93 and Conclusions of Law Nos. 9–12. Having thus appraised the case, the chancellor refused to appoint a receiver, providing, however, that the liquidation would proceed under the supervision of the court.

–C–

■ In determining in a specific case whether the lower court has properly exercised its discretion in arriving at the decision whether or not to appoint a receiver, the appellate court will consider all of the facts and circumstances. *Beaumont v. Beaumont, supra; Johnson v. Kunz,* 75 S.D. 22, 58 N.W.2d 227 (1973). "In the absence of a clear abuse of discretion, matters purely within the discretion of a trial court are not reversible on appeal . . . [and] [t]o justify a reversal, the abuse of discretion must be clearly shown." *C. E. Williams Co. v. H. B. Pancoast Co.,* 412 Pa. 166, 170, 194 A.2d 189, 191 (1963) (citations omitted). *See Brady v. Brady,* 168 Pa.Super. 538, 79 A.2d 803 (1951).

■ Appellants argue that where, as here, there is dissension among the partners, it is an abuse of discretion to refuse to appoint a receiver. In support of this argument they cite *Sellers v. Hanratty,* 343 Pa. 316, 319, 22 A.2d 697, 698 (1941); *Sloan v. Moore,* 37 Pa. 217, 224 (1860); *Weissman v. Henkin,* 154 Pa.Super. 12, 16, 34 A.2d 907, 910 (1943); *Geshinsky v. Geshinsky,* 18 Fayette Leg.J. 101 (1955); and *Macielag v. Gron,* 35 Del.Co.Rpts. 76, 82 (1947).[24]

**24.** In their brief appellants argue that the chancellor's reliance on *Tate v. Philadelphia Transportation Co., supra; McDougall v. Huntingdon & Broad Top R. & C. Co., supra*; and *Northampton National Bank of Easton v. Piscanio, supra,* was misplaced because those cases dealt with corporations or motions filed by creditors, and "are therefore inapposite insofar as they assume too high a legal standard for the appointment of a receiver in this context." Appellants' Brief at p. 58. Both *Tate* and *McDougall,* however, were cited by the Supreme Court in *Waddell v. Schriber, supra,* a partnership dissolution case. *And see Moffett v. Peirce, supra,* 344 Pa. at 22, 24 A.2d at 450, *quoting Beaumont v. Beaumont, supra. Cf. Nolan v. Nolan,* 8 Lack.Leg.News 291 (1902) (dissension and other questionable practices by the partners; court appoints the most experienced partner as receiver).

While dissension among the partners is a factor that has been considered in deciding whether appointment of a receiver is necessary, *see* Annotation, *supra,* and while one court has gone so far as to hold it an abuse of discretion not to appoint a receiver based upon dissension among the partners in dissolution, *see Wrenn v. Wrenn, supra,*[25] we shall not reverse the chancellor in this case merely because the record indicates that there was dissension. In *Waddell v. Schriber, supra,* there was dissension among the partners concerning dissolution, and yet the Supreme Court reversed the lower court's appointment of a receiver pending arbitration of the dispute because there was no proof that a receiver was necessary to prevent dissipation of the assets. Also, in *Beaumont v. Beaumont, supra,* and *Moffett v. Peirce, supra,* there was dissension, but the Court affirmed the lower court's refusal to appoint a receiver.[26] *See Klass v. Yavitch, supra* (reversing lower court's appointment of receiver where dissension proved but no proof of loss or waste); *Ingram v. Clover Leaf Lumber Co., supra* (mere disagreement of partners in dissolution not enough to warrant receiver). Moreover, in cases involving corporations our courts have held that in the absence of a statute providing otherwise, mere dissension among the stockholders and directors is insufficient to warrant the appointment of a receiver "unless there is present danger to the interests of the stockholders consisting of a serious suspension of or interference with the conduct of the business, and a threatened depreciation of the value of the assets consequent thereon, which may be remedied by a receiver." *McDougall v. Huntingdon & Broad Top R. & C. Co., supra,* 294 Pa. at

**25.** The court in *Wrenn* stated that the effect of appointing a receiver in a partnership dissolution case was not as bad as the appointment of receivers in other situations. *But see* notes 22 *supra* and 29 *infra.*

**26.** We recognize that the situation presented in *Waddell v. Schriber, supra,* differed from that presented in this case since *Waddell* involved the appointment of a receiver pending arbitration. However, in our opinion this difference is not so substantial as to justify our holding that where there is dissension and freezing out, for that reason alone we should require the chancellor to appoint a receiver. *See Moffett v. Peirce, supra; Eisenberg v. Eisenberg, supra.*

120, 143 A. at 579. *See Hall v. City Park Brewing Co.*, 294 Pa. 127, 143 A. 582 (1928); *Hlawati v. Maeder–Hlawati*, 289 Pa. 233, 137 A. 235 (1927). Indeed, to hold as appellants request, that the chancellor is required to appoint a receiver in every partnership dissolution case where there is dissension among the partners, would be to hold that a receiver must be appointed in almost every case, for it will be a rare case where a partnership dissolution is litigated without dissension.

None of the cases cited by appellants persuades us to a contrary conclusion. *Sellers v. Hanratty, supra,* and *Sloan v. Moore, supra,* must be read in light of the later decisions in *Waddell v. Schriber, supra,* and *Moffett v. Peirce, supra.* Moreover, in neither *Sellers* nor *Sloan* was the chancellor reversed for not appointing a receiver based upon the existence of dissension; in both cases the chancellor's appointment of a receiver was affirmed as a proper exercise of discretion based upon the particular facts presented. *Geshinsky v. Geshinsky, supra,* and *Macielag v. Gron, supra,* are lower court decisions. It is true that in *Weissman v. Henkin, supra,* this court reversed the chancellor's decision refusing to appoint a receiver and made statements that support appellants' position here. However, in that case this court was correct in perceiving the need for a receiver because the innocent partner was away in the armed forces, and not in a position to wind up the partnership affairs, and the remaining partner had misappropriated partnership assets. Moreover, in their pleadings both parties had requested the appointment of a receiver.

Appellants also argue that the fact that Moe and Perch Hankin froze them out of the daily operations of the partnership required the appointment of a receiver. However, in both of the cases cited by appellants, *Conrad v. Ehrhart*, 63 York 33 (1949), and *Young v. Young*, 15 Somerset Leg.J. 145, 151 (Chester 1941), there was not only a freezing out of the partners from the daily operations of the business but also a denial of those partners' status as partners in all

respects.[27] In the present case, while Moe and Perch Hankin have effectively frozen Max and Samuel Hankin out of the management of the partnership enterprises during liquidation, they have not denied appellants' rights to be informed concerning the business or to share in the proceeds of the partnership assets. *See Johnson v. Kunz, supra* (receiver appointed where partner in control was not liquidating but was treating assets as though they were his); *Lindenfelser v. Lindenfelser*, 396 Pa. 530, 153 A.2d 901 (1959) (abuse of discretion not to appoint receiver where wife had excluded husband from possession and rental income of entireties property). While we do not condone Moe and Perch Hankin's conduct, we cannot conclude that it was such as to require us to reverse the chancellor's conclusion that a receiver was not necessary, especially given that the lower court has assumed supervision of the liquidation and will be in the position to prevent any future wrongdoing.

Besides arguing that the existence of dissension among the partners and the freeze out required the appointment of a receiver as a matter of law, appellants also attack the chancellor's findings that Moe and Perch Hankin were the partners best qualified to handle the liquidation, that under their control the liquidation was proceeding properly and promptly, that there was no substantial waste, and that the injury that would be done by appointing a receiver would outweigh the benefits that would be gained.

We note that some of the chancellor's findings are ones that we have earlier characterized as inferences or deductions from the evidence, *i. e.*, Findings of Fact Nos. 17, 43, 69, 70, 85, 86, 88, and 97. Having made our own deductions from the evidence, we have arrived at the same findings as did the chancellor. It does appear that Samuel Hankin was very active in partnership affairs, but it also is clear that Moe and Perch Hankin were the prime forces in the growth

**27.** In *Conrad* the defendant partners denied that the plaintiff was a partner. In *Young* the wife–partner refused to give the husband–partner or the court any information concerning the finances of the business or the funds she had appropriated; she also denied that her husband was a partner.

of the businesses and the most qualified to manage the liquidation. The chancellor's detailed findings concerning the efforts to liquidate each individual property in the portfolio [28] are based upon the evidence and fully support his finding that Moe and Perch Hankin are proceeding properly and promptly with the liquidation. The chancellor's finding concerning the injury that would be done if a receiver were appointed was also proper, given the situation disclosed by the evidence. Moreover, this finding does not reflect only the chancellor's own opinion but also the opinion of Philip Wiser, an experienced real estate dealer.[29] The chancellor's finding that there had been no substantial waste of partnership assets is also supported by the record. Appellants have consistently alleged waste and dissipation of assets but have failed to prove those allegations.

In arguing that the chancellor's findings are not supported by the record, appellants claim that facts not specifically considered by the chancellor in his findings show waste, mismanagement, and bad faith on the part of appellees.

One example of waste and mismanagement appellants point to is the fact that Moe and Perch Hankin had the partnership make some very questionable contributions to a

**28.** *See* Chancellor's Findings of Fact Nos. 71 through 80.

**29.** Mr. Wiser's testimony was as follows:
Q. Are you in a position to tell us–give us your opinion as to what the impact would be on the price, value, of the Hankin properties in the event that a receiver were appointed?
A. Well, in my past experience and in our office's experience of what I know, the best price obtainable is not by having a receiver or a trustee, because the purchaser then–if he is a purchaser at that point–is looking for a bargain. It has to be a sacrifice or just no sale, and when you go that route, you don't get the top dollar. No, you do not. But something else happens when you go that route, and that is that when it isn't sold, then that property or properties–there's an expression–have the mark of Zorro on it, and under those circumstances, it becomes very difficult to sell. Whereas in a private sale, you don't make every deal you go after or even every deal that you think is pretty near completed, but no one knows about it. You go to the next party, the next party, and eventually you sell it to the best and highest customer that you have. It's an entirely different market, and we always recommend the market where the private buyer is your best buyer.
N.T., November 2, 1978, at 492–93.

political campaign in 1976. However, the testimony concerning these contributions, and the fact that they were made, does not convince us that there was such waste and mismanagement as to require us to overrule the chancellor's decision that a receiver is not necessary.[30] Another example appellants point to concerns the refinancing of the partnership's unsecured liabilities, but neither does it convince us that the chancellor abused his discretion. The partnership had obtained unsecured loans from Central Penn Bank in the amount of approximately $3.7 million. Officials at the bank wanted to secure the loan by placing liens on some of the partnership properties. Moe and Perch Hankin, without prior consultation with Max or Samuel Hankin, entered into negotiations with Girard Bank and obtained an unsecured loan of $4 million. With this they paid Central Penn Bank, using the balance to meet current obligations. Appellants, particularly Samuel, argue that Moe and Perch should not have refinanced the debt but instead should have permitted Central Penn Bank to place the liens. Appellants also contend that the debt should not have been increased. However, the past practice of the partnership had been to have only unsecured liability and to avoid having liens placed upon the partnership properties. It was also the opinion of Moe and Perch that liquidation would be easier without the liens. Moreover, it does not appear that the current obligations that were met by using the excess of the Girard loan were invalid. Thus, while the refinancing dispute is an example of the dissension among the partners as to how the business should be liquidated, it does not provide us with a reason for overruling the chancellor's decision not to appoint a receiver.[31]

**30.** Appellants also presented testimony concerning some questionable employment practices involving the use of overtime, which may have been at the direction of appellees. Appellants have not argued on this appeal, however, that these practices required the appointment of a receiver.

**31.** We recognize appellants' claim that delay in liquidation and abuse in reinvesting may so prolong the distribution of the proceeds of liquidation that appellees' position will be enhanced. However, we

Appellants also claim that Moe Hankin's testimony concerning his efforts to liquidate the assets was untrue, and that in fact the liquidation efforts are nothing but a sham. Appellants note that on February 1 and 2, 1979, Moe Hankin testified that the Evans–Pitcairn Corporation was then negotiating with Philip Wiser of the Albert Greenfield Company to purchase the Hidden Springs Golf Course from the partnership. However, on February 15, 1979, Norman Baseman of the Greenfield Company wrote Robert Chesco of the Evans–Pitcairn Corporation, indicating that he believed that his organization had informed the Hankins before February 1 that Evans–Pitcairn was not interested. Moreover, Mr. Chesco stated in an affidavit that he had not at any time indicated to anyone from the Greenfield Company that he was interested in Hidden Springs after he had visited the site. However, the chancellor was apparently fully aware of this incident before he entered his adjudication.[32] In any event the affidavit of Philip Wiser indicates that Moe Hankin had based his testimony on a letter that he had received from Wiser on January 29, 1979, in which Wiser had indicated that he believed that the Evans–Pitcairn Corporation was still interested in the Hidden Springs site.[33] Wiser also stated that at the time he wrote the letter he did not know that Mr. Baseman had been informed by the Evans–Pitcairn Corporation that it was not interested. Thus, the evidence does not, as appellants claim, show that Moe Hankin inten-

believe that since the lower court has assumed supervision of the liquidation, it will be in a position to avoid those dangers.

**32.** The evidence was presented by means of a motion to supplement the record, filed on February 27, 1979.

**33.** In his letter of January 29 to Moe Hankin, Wiser stated:

As to the Hidden Springs Golf Courses as an industrial park, we arranged an inspection with Evans Pitcairn & Company and they requested information on the income and expenses covering the operation of these Golf Courses. You furnished us this information and we forwarded same to them. Evans Pitcairn never operated golf courses. This is not their specialty; however, they are giving serious thought to the Hidden Springs location as this site lends itself to the development of an exceptional industrial park operation.
R.R. at 200a.

tionally misled the chancellor but only that he testified as to what he thought was the truth based upon Wiser's letter. In any case, the evidence obviously did not shake the chancellor's faith in Moe Hankin's testimony that he was liquidating in good faith, nor do we find it so convincing as to justify our overruling the chancellor's appraisal.

We have considered the legal and factual arguments raised by appellants in support of their position that a receiver was necessary but have found none that convinces us that the chancellor clearly abused his discretion in refusing to appoint a receiver.[34] We do point out that by permitting appellees to remain in control of the liquidation under court supervision, neither the chancellor nor this court has in any way approved of appellees' past, frequently petty, actions toward appellants. Instead, we understand the chancellor's refusal to appoint a receiver as an attempt by the chancellor to ensure that the liquidation already in progress will not be disturbed but will proceed as soon as possible and on the best terms. We recognize, and have some sympathy with, appellants' apprehension that appellees will attempt to advance their position to appellants' detriment, but we are sure that in supervising the liquidation, the lower court will ensure that appellants are dealt with fairly.

–2–

Samuel and Harriet Hankin[35] argue that since the agreements to sell Willow Grove Park to Pan American Associates were signed by only eight of the ten partners, they are unenforceable under the Statute of Frauds, and that the chancellor therefore erred in upholding the agreements. In support of this argument they cite *Feingold v. Davis*, 444 Pa. 339, 282 A.2d 291 (1971), where the Supreme Court held that one partner could not bind another partner in the sale of the partnership assets unless his authority to do so was evidenced by a writing.

---

34. We also must decline Samuel Hankin's invitation to appoint him as the partner in control of the liquidation.

35. *See* note 5 *supra*.

Unlike *Feingold v. Davis, supra,* however, this case involves a partnership in the process of winding up, where the agreements in question have been enforced by an order of the court that has assumed supervision over the winding up. A judicial sale is not within the Statute of Frauds. *In re Susquehanna Chemical Corp.,* 92 F.Supp. 917, 918 (W.D.Pa.1950); *Emley v. Drum,* 36 Pa. 123, 125 (1860); *King v. Gunnison,* 4 Pa. 171, 172 (1846). *See Campbell v. Carter,* 248 Ala. 294, 27 So.2d 490 (1946); *Allen v. Bennis,* 193 Ga. 556, 19 S.E.2d 516 (1942); *Lewis v. Lewis,* 43 Ga.App. 227, 158 S.E. 364 (1931); *Beeson v. Pierce,* 51 Ind.App. 201, 98 N.E. 380 (1912); *Kentucky Utilities Co. v. Steenman,* 283 Ky. 317, 141 S.W.2d 265 (1940); *Cook v. Safe Deposit & Trust Co.,* 172 Md. 398, 191 A. 713 (1937); *Pellston Planing Mill & Lumber Co. v. Van Wormer,* 198 Mich. 648, 165 N.W. 724 (1917); *Andrews v. O'Mahoney,* 112 N.Y. 567, 20 N.E. 374 (1889); *Przewozniczek v. Machowicz,* 205 N.Y.S. 795, 123 Misc. 376 (1924); *Rice v. Ahlman,* 70 Wash. 12, 126 P. 66 (1912). In this case the chancellor carefully reviewed the agreements, heard evidence with respect to the terms, concluded that enforcing the agreements was in the best interest of the partnership, and ordered the sale to proceed.[36] While the agreements were entered into before the court assumed supervision over the dissolution of the partnership, nevertheless the sale as ordered by the court still qualifies as a judicial sale not within the Statute of Frauds. *Cf. The First National Bank of Boston v. Fairhaven Amusement Co., Inc.,* 347 Mass. 243, 197 N.E.2d 607 (1964) (oral agreement not arrived at under aegis of court not clothed with protection from fraud necessary to remove it from Statute of Frauds).

**36.** In his Conclusion of Law No. 18, the chancellor stated:

18. Pursuant to this Court's supervisory power over the present litigated dissolution proceeding, which power the Court will exercise upon "cause shown" . . ., this Court–finding the Two Willow Grove Park Agreements in the best interests of all partners, and finding "cause shown" in the refusal of two partners to sign the Agreements–will order Willow Grove Park sold to Pan American Associates pursuant to the existing Agreements.

■ Samuel and Harriet Hankin argue further, however, that the chancellor acted improperly in ordering the sale because the power of the court to supervise the winding up of partnership affairs does not include the power "to order a sale of real property to a specific third party which is opposed by two living partners." Appellants' Brief at p. 44. At most, they say, the court may order a public sale of the property to the highest bidder.

■ The court below has the power to wind up the partnership upon cause shown. 59 P.S. § 359.[37] There is no hard and fast rule applicable alike to all partnership dissolutions; rather, "a wide discretion is necessarily vested in a court of equity." *Slemmer's Appeal, supra* at 177–78; *Klatt v. Walling*, 239 S.C. 17, 121 S.E.2d 233 (1961). *See Clifford v. Gardner*, 202 Ala. 602, 81 So. 544 (1919); *Fortugno v. Hudson Manure Co.*, 51 N.J.Super. 482, 144 A.2d 207 (1958). In exercising its wide discretion, the court should make such orders as may be necessary to serve the best interests of all the partners. *See, e. g., Hovland v. Smith*, 22 F.2d 769 (9th Cir. 1927) (court properly ordered one partner to post bond); *Owen v. Cohen*, 19 Cal. 147, 119 P.2d 713 (1941) (court did not abuse discretion in providing that partner in bidding for assets could use as credit proceeds that would accrue to him from sale); *Steinberg v. Goldstein*, 145 Cal.App.2d 692, 303 P.2d 80 (1956) (court had discretion to order partner to return partnership equipment to receiver and pay rental for it); *Peebler v. Olds*, 56 Cal.App.2d 13, 132 P.2d 236 (1942) (court entered order reforming deed of sale). Moreover, the court's supervisory power over the liquidation of a partnership necessarily includes the right to determine the sort of sale to be conducted. *Ellis v. Ellis*, 415 Pa. 412, 203 A.2d 547 (1964) (terms and method of sale subject to determination by court); *Georgen v. Nebrich*, 4 A.D.2d 526, 167 N.Y.S.2d 491, 493 (1957) ("[i]f a sale of partnership property is indicated, the court may so order, the method of sale being in the court's discretion."). *See Lesser & Son v. Seymour*, 212 P.2d 554 (Cal.App.1949) (court had discretion to modify earlier

37. *See* note 22 *supra*.

order of sale to accept late bid since acceptance of bid was in best interests of partnership). Thus, if the court in its discretion decides that a sale is necessary, it is not then required to order one particular sort of sale but may instead order that sort of sale as it determines is best suited to serving the greater good of all the partners in the particular circumstances. *See Eisenberg v. Eisenberg, supra* (lower court found open public sale inappropriate and instead ordered closed sale between partners). Therefore, the court may order a sale of some or all of the assets to a particular person pursuant to agreements entered into before the court assumed supervision of the dissolution where the court determines that that sale is in the best interests of the partners. The fact that a minority of the partners objects makes no difference. Indeed, in exercising its supervision in a litigated partnership dissolution the court will rarely find its order agreeable to all the partners. The fact that not all the partners agree does not defeat the court's power and its duty to order the sort of sale that it believes is best suited to serving the interests of all.

Having thus determined that it was within the chancellor's discretion to order the sale of Willow Grove Park to Pan American Associates under the existing agreements, we are required to consider whether by ordering the sale the chancellor nevertheless committed an abuse of discretion. Again, the burden is on appellants to prove that there was a clear abuse of the chancellor's discretion. *See C. E. Williams Co. v. H. B. Pancoast Co., supra.*

Appellants have failed to persuade us that an abuse of discretion occurred in this case. The evidence presented to the chancellor was that the sale of Willow Grove Park to Pan American Associates served the best interests of the partnership because the sale was at a price over the market value and because the proposed development of the property as a shopping center would have a positive effect on the value of the other partnership properties in the immediate vicinity. Indeed, both appraisers who testified at the hearings opined that the property was best suited for develop-

ment as a shopping center, and both set the value of the property well below the $90,000 per acre that Pan American Associates had agreed to pay.[38] By contrast, appellants offered no evidence that this price was inadequate or that the proposed use was unsatisfactory. We therefore accept the chancellor's Finding of Fact No. 59 that the sale of the Willow Grove Park to Pan American Associates "is a sale well calculated to advance the liquidation, and should go forward for that reason."

**38.** The chancellor discussed the testimony of the appraisers in his findings of fact as follows:

49. Charles F. Seymour, president and chief executive officer of Jackson–Cross Company, is an experienced and qualified real estate appraiser.

50. Mr. Seymour, having been retained by Pan American Associates to appraise Willow Grove Park, concluded that the highest and best use of that property is as a planned regional shopping center.

51. In his appraisal, Mr. Seymour concluded that the fair market value of the Willow Grove Park premises is $82,000 per acre as of January 29, 1979.

52. Based on Mr. Seymour's qualifications, his appraisal . . ., and his testimony as to the basis of his conclusion as to fair market value . . ., the Court finds that Mr. Seymour's appraisal of the Willow Grove Park property at a fair market value of $82,000 per acre as of January 29, 1979, . . . is a fair and reasonably accurate appraisal of the fair market value of said premises as of said date.

53. Robert W. Plank is an experienced and qualified real estate appraiser.

54. At the request of the majority Hankins, Mr. Plank appraised the property known as Willow Grove Park, which appraisal is dated January 2, 1979. . . .

55. In the course of his appraisal, for reasons specified therein . . . and testified to in Court . . ., Mr. Plank concluded that the highest and best use of the Willow Grove Park premises is for a shopping center.

56. Based on factors detailed in his appraisal . . ., and testified to in Court . . ., Mr. Plank appraised the Willow Grove Park premises at a fair market value of $80,000 per gross acre.

57. Based on Mr. Plank's qualifications, his appraisal and his testimony, the Court concludes that Mr. Plank's appraisal of the Willow Grove Park premises at $80,000 per gross acre is a fair and reasonably accurate appraisal.

58. Based on the testimony of Charles F. Seymour . . ., Robert W. Plank . . ., and Aaron A. Robinson . . ., the Court concludes that the $90,000–per–acre price in the two existing Agreements to sell approximately 85 acres in Willow Grove Park to Pan American Associates is an excellent price for that property.

Having decided that the Statute of Frauds does not apply to this judicial sale and that the chancellor did not abuse his discretion in ordering the sale, we need not reach the other arguments that have been made by appellees concerning the sale.[39]

–3–

Appellants' other requests for equitable relief also must be rejected.

■ Appellants request that there be a distribution in kind of the partnership assets. While section 360(a) of the Uniform Partnership Act provides that the property shall be applied to discharge the partnership liability and the surplus "applied to pay in cash the net amount owing to the respective partners," some courts have recognized that in some cases a distribution in kind may be appropriate. See *Rinke v. Rinke*, 330 Mich. 615, 48 N.W.2d 201 (1951); *Macielag v. Gron, supra. Cf. Conrad v. Ehrhart, supra,* (suggests that there should be a cash distribution and not an asset distribution unless all partners agree). However, in this case a majority of the partners apparently oppose such a distribu-

**39.** In support of the conclusion that the agreements with Pan American Associates are not within the Statute of Frauds appellees have argued that the Uniform Partnership Act permits liquidation sales by a majority of the partners because a majority of partners may bind the partnership to sales entered into in the ordinary course of the partnership business and the ordinary course of business of a partnership in dissolution is the liquidation of the partnership properties. *See* Crane & Bromberg, Partnerships, § 80, p. 460 (1968); Bromberg, Partnership Dissolution–Causes, Consequences and Cures, 43 Tex.L. Rev. 631, 649 (1965).

Appellees also point to the fact that they plan to use the proceeds from the sale of Willow Grove Park to Pan American Associates to pay off partnership debts, and argue from this that the Statute of Frauds is inapplicable because sales of partnership realty to satisfy partnership debts are deemed to be sales of personalty. *See Miller v. Miller,* 370 Pa. 520, 88 A.2d 784 (1952); *Faust v. Heckler,* 359 Pa. 19, 58 A.2d 147 (1948); *Hall's Estate,* 266 Pa. 312, 109 A. 697 (1920). *And see Riddle v. Whitehill,* 135 U.S. 621, 10 S.Ct. 924, 34 L.Ed. 282 (1890); *Shanks v. Klein,* 104 U.S. 18, 26 L.Ed. 635 (1881); *In Re Rudy,* 25 F.Supp. 912 (W.D.Ky.1939); *Andrulis v. First National Bank of Lake Forest,* 4 Ill.App.3d 436, 281 N.E.2d 417 (1972); *In Re Moore's Estate,* 34 Tenn.App. 131, 234 S.W.2d 847 (1950); *In Re Estate of Schreiber,* 68 Wis.2d 135, 227 N.W.2d 917 (1975); Annotation, 80 A.L.R.2d 1107 (1961).

tion, and the chancellor has already ordered a liquidation by sale of the assets. *See Dreifurst v. Dreifurst,* 90 Wis.2d 566, 280 N.W.2d 335 (1979). Since we have not been convinced that the chancellor has abused his discretion, we shall not consider ordering him to adopt an alternative approach.

Appellants also request that the family law firm of Hankin, Hankin & Hankin be disqualified from representing the family partnership. The only time before the chancellor filed his adjudication that appellants directly requested that the law firm be disqualified was at the initial hearing, on July 6, 1978. The chancellor then refused to enter such an order, stating that he would "not entertain such an order at this time." N.T., July 6, 1978, at 6. The request was not pressed at the later hearings, and the evidence presented at those hearings, including that concerning the law firm, was directed toward the issue of the necessity of appointing a receiver and not toward the disqualification of the law firm as a special and separate form of relief. It was therefore to be expected that the chancellor would not, and he did not, consider the request in his adjudication. Appellants' arguments, raised in their exceptions to the adjudication and on this appeal, that disqualification is required because there is a conflict of interest and waste, should have been pressed in the hearings before the chancellor below as a separate request for relief.

In any event, the present record does not contain evidence of either a conflict of interest or waste sufficient for this court on appeal to order the law firm disqualified. The law firm may now be performing some valuable services to the partnership by treating the routine legal matters generated by the liquidation and the normal partnership business; we cannot tell. Moreover, there is no convincing evidence that the law firm is at present acting other than in support of the liquidation ordered by the chancellor. If appellants believe that there is evidence that indicates that the law firm must be disqualified, they should present it to the lower court so that the court may consider it.

 Appellants also request that their children be reinstated as employees of the partnership and receive back pay. It may well have been unfair to appellants and their children that the children were fired or forced out by appellees while appellees' children remained employed by the partnership. If appellants' children believe that they have any legal claim, for instance, for breach of contract, they may initiate an appropriate action. However, as an appellate court, this court will not order a lower court engaged in supervising the liquidation of a partnership to require that certain employees be rehired and reimbursed at $26,000 a year.

 Appellants' request that this court prohibit reinvestment of the proceeds of liquidation and prohibit the use of partnership assets to bestow disproportionate benefits on appellees and their relatives also must be rejected. These requests should be directed to the lower court as the liquidation proceeds under its supervision, and as the occasion may arise.[40]

Affirmed.