John HAYMOND, Haymond Napoli Diamond, P.C.-CT,

v.

Marvin LUNDY.

v.

John Haymond, Robert Hochberg, Haymond, Napoli, Diamond, P.C.-CT.

No. CIV. A. 99–5048.

United States District Court, E.D. Pennsylvania.

Aug. 31, 2001.

Judah I. Labovitz, Deborah H. Bjornstad, Mann, Unger, and Specter, Philadelphia, PA, for plaintiffs.

Paul R. Rosen, Alan B. Epstein, Bruce L. Thall, Spector, Gadon and Rosen, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

Shapiro, Senior District Judge.

This action arises from the dissolution of Haymond & Lundy, LLP ("H&L"), a personal injury law firm. The law firm was formed on October 13, 1997; initially, the partners were Marvin Lundy ("Lundy"), John Haymond ("Haymond") and Robert Hochberg ("Hochberg"). Lundy, who had practiced law in the Philadelphia area for some time, contributed his pending cases to the firm, and Haymond and Hochberg, who had been partners for some time in a Connecticut law firm, contributed cash for expenses. The partnership continued until October 8, 1999, when Lundy declared the partnership dissolved in a letter to Haymond and Hochberg. Lundy and Haymond each immediately filed civil actions in the United States District Court for the Eastern District of Pennsylvania.

## Procedural History

In his complaint, Haymond asserted claims on behalf of himself and his new law firm, Haymond Napoli Diamond, P.C.-CT ("HND–CT"), against Lundy for anticipatory breach of the Haymond & Lundy Partnership Agreement ("Partnership Agreement" or the "Agreement"), Lanham Act violations, unfair competition, tortious interference and breach of fiduciary duty. Haymond alleged that Lundy repudiated the dissolution provision of the Partnership Agreement and then, in contravention of that provision, solicited former clients of H&L. Haymond also alleged that Lundy used false and misleading information in those solicitations and tortiously interfered with Haymond's prospective contractual relationships with the former clients. Finally, Haymond alleged that Lundy delayed the distribution of certain funds until after he had dissolved H&L because if received during the term of the partnership the funds would have been paid to the partnership, but if received after dissolution they were payable to Lundy alone.

Lundy asserted claims against Hochberg for unauthorized practice of law, against Haymond and Hochberg for negligent misrepresentation, breach of fiduciary duty, fraud, fraud in the inducement, aiding and abetting fraud, conspiracy to commit fraud, and breach of the Partnership Agreement, and against Haymond, Hochberg, and John Haymond, P.C. t/a Haymond & Lundy, LLP for civil RICO and RICO conspiracy. Lundy, amending his complaint, added Scott Diamond and Haymond's new law firm, HND–CT, as defendants and asserted an additional claim against Haymond and Diamond for aiding and abetting and conspiracy to commit Hochberg's unauthorized practice of law. Lundy alleged that Haymond and Hochberg: (1) induced him to enter the Partnership Agreement by concealing Hochberg's pending conviction for bank fraud; (2) failed to inform him of Hochberg's disbarment in Massachusetts, consequent suspension in Connecticut, and the transfer of his partnership interest to Haymond; (3) permitted Hochberg to continue practicing law and serving as managing partner of H&L despite disbarment in Massachusetts and suspension in Connecticut; and (4) conspired to steal his practice, property and reputation, with the aid of Diamond, a H&L associate in whom Lundy had placed great trust.

Cross-motions for temporary restraining orders and preliminary injunctions were denied on October 15, 1999. The actions were consolidated under Civil Action Number 99–5048, in which Lundy was plaintiff. With the consent of the parties, Martin Heller, Esq. was appointed special master to facilitate the division of the cases and distribution of files post-dissolution, and participate in negotiations concerning the lease of the space formerly occupied by H&L. *See* Orders, Oct. 25, 1999 & Nov. 9, 1999.

Each party filed a motion to dismiss. The cross-claims for breach of fiduciary duty were dismissed because the action sounded in contract, not tort. *See Haymond v. Lundy*, No. 99–5015 & 99–5048, 2000 WL 804432, *7–8 & 13–15, 2000 U.S. Dist. LEXIS 8585, * 22–25 & 42–44 (E.D. Pa. June 22, 2000). Lundy's RICO, fraud and negligent misrepresentation claims were dismissed because Lundy admitted that during the partnership negotiations with Haymond and Hochberg his attorney learned of Hochberg's pending indictment for bank fraud. *See id.* at *4, 2000 U.S. Dist. LEXIS 8585, *11–22. His attorney's knowledge was imputed to Lundy.[1] *See*

---

1. Lundy later admitted he had actual knowledge of Hochberg's indictment during the

id. at *5, 2000 U.S. Dist. LEXIS 8585, *14–15. Once he knew of the indictment, Lundy could not have reasonably relied on any misrepresentation made by Hochberg and Haymond about the indictment's insignificance or its probable lack of effect on Hochberg's licenses to practice law. *See id.* at *5–6, 6–7, 7, 2000 U.S. Dist. LEXIS 8585, *15–16, 18–19, & 22.

After the court ruled on the cross-motions to dismiss, Lundy voluntarily dismissed the two remaining counts of his first amended complaint and filed a notice of appeal. Because the cases had been consolidated, the court found that Lundy had prematurely appealed from a non-final order and held it retained jurisdiction to proceed on Haymond's counterclaims. The parties were realigned with Haymond as plaintiff.

In his answer to Haymond's complaint, Lundy asserted three counterclaims: (1) unauthorized practice of law against Haymond, Hochberg, Diamond, and HND–CT; (2) breach of contract against Haymond and Hochberg; and (3) civil conspiracy against Haymond, Hochberg, Diamond, and HND–CT. The claim against Haymond and Diamond for aiding and abetting and conspiracy to commit the unauthorized practice of law was dismissed. *See Haymond v. Lundy*, No. 99–5048, 2000 WL 1824174, *2, 2000 U.S. Dist. LEXIS 17879, *6 (E.D.Pa. Dec. 12, 2000).

At the close of discovery, the parties filed cross-motions for summary judgment. The court found that certain Lundy statements alleged to have misled former H&L clients were not deceptive as a matter of law and granted Lundy summary judgment on all but one of Haymond's Lanham Act and unfair competition claims. *See Haymond v. Lundy*, No. 99–5048, 2001 WL 15956, 2001 U.S. Dist. LEXIS 54 (E.D.Pa. Jan. 5, 2001). The court, finding that Lundy did not allege an underlying tort, proof of which is required to uphold a finding of civil conspiracy, granted Haymond summary judgment on Lundy's civil conspiracy counterclaim. *See Haymond v. Lundy*, No. 99–5048, 2001 WL 74630, 2001 U.S. Dist. LEXIS 630 (E.D.Pa. Jan. 29, 2001).

Each party's breach of contract claim remained, as did Haymond's claims for violation of the Lanham Act and tortious interference and Lundy's counterclaim against Hochberg for unauthorized practice of law. The court determined the tort claims should be severed and stayed pending the outcome of a trial on the cross-claims for breach of contract, and that the trial of the contract claims should be bifurcated.

A trial by jury on contractual liability commenced on January 16, 2001. At trial, Haymond alleged that Lundy breached Partnership Agreement § 3.02 requiring Lundy to use his best efforts to obtain as large a percentage of the ML&L fees as possible for the benefit of the partnership. The ML&L fees were portions of the fees obtained by Lundy or his former partner, Donald Manchel ("Manchel"), for successfully litigating or settling cases of their former firm, Manchel, Lessin & Lundy ("ML&L"), after the dissolution of that firm. The ML&L fees had been placed in an escrow account by an arbitrator pending his decision on the respective percentage entitlements of Lundy and Manchel to those funds. Under § 3.02(b) of the Haymond & Lundy Partnership Agreement, ML&L fees received by Lundy during the term of the H&L partnership would be contributed to the partnership, but any distributions made after the dissolution of Haymond & Lundy would be paid to Lun-

partnership negotiations. *See* Trial Tr., Jan. 19, 2001, at 129–130.

dy alone. Haymond claimed Lundy delayed the distribution of the ML&L fees until after he dissolved the partnership so that he, not the partnership, would receive his share of those fees, and in so doing failed to act in the best interest of the partnership.

Haymond also claimed that Lundy breached Partnership Agreement § 9.02(e) requiring the partners to allocate the H&L cases according to certain percentages based on approximate value. The H&L cases were the cases that originated at Haymond & Lundy, LLP, i.e. the client came to H&L during the term of the partnership. The allocation of these cases upon dissolution of the firm was to be agreed upon by the partners in good faith. *See* Partnership Agreement, § 9.02(e). Haymond claimed that Lundy violated this term of the Partnership Agreement by soliciting the clients of H&L by letter and telephone post-dissolution to obtain a greater portion of the cases.

Lundy alleged that Haymond and Hochberg breached the Partnership Agreement by failing to notify Lundy of their entry into a Conditional Agreement. The Conditional Agreement transferred Hochberg's ownership interest in Haymond & Lundy to Haymond. *See* P.Ex. 49. Although signed in November, 1998, Haymond and Hochberg agreed that the transfer of interest would not occur unless and until Hochberg's license to practice law in the state of Connecticut was suspended. Connecticut suspended Hochberg's license on an interim basis on April 17, 1998, but neither Hochberg nor Haymond informed Lundy of the transfer of partnership interests.

Lundy also alleged that Haymond breached Partnership Agreement § 9.02(e). Under that provision, Lundy was to receive "all right, title and interest in and to" the ML&L cases upon dissolu-

tion. Lundy claimed that Haymond solicited ML&L clients post-dissolution.

On January 26, 2001, the jury returned a liability verdict in favor of Haymond. The jury found that Lundy had materially breached the Partnership Agreement by failing to: (1) use his best efforts to obtain the ML&L fees on behalf of the partnership; and (2) abide by the Partnership Agreement terms regarding dissolution. The jury found that Haymond had not breached the Partnership Agreement.

### Discussion

In his amended complaint, Haymond requested injunctive relief as a remedy were Lundy found to have breached the contract. At the close of the liability phase, the parties agreed the jury should be dismissed and the court should determine appropriate injunctive relief. The parties filed written submissions and the court heard oral argument on this issue. The question presented is: in light of the jury's findings, should dissolution proceed under the Partnership Agreement or the Uniform Partnership Act?

The dissolution provision of the Partnership Agreement would require that the partners: (1) return to Lundy the open ML&L cases and the furniture he contributed to the partnership; (2) divide the H&L cases among themselves according to a certain formula and then, on the close of each case, redistribute the fees received from the case according to a different formula; (3) liquidate all non-distributed partnership assets; and (4) distribute the partnership funds in the order provided. In contrast, the Uniform Partnership Act requires that all partnership assets be liquidated. The partnership funds are then: (1) used to pay all debts of the partnership; and (2) divided among the partners in accordance with their respective part-

nership interests.[2] *See* 15 Pa. Cons.Stat. Ann. §§ 8362 & 8360.

## I. The Applicable Dissolution Provision

■ Although Haymond's amended complaint requested that the dissolution provision of the Partnership Agreement be enforced,[3] he now argues that Lundy's material breach cancelled the Partnership Agreement and, in the absence of a contract, the provisions of the Uniform Partnership Act should govern dissolution. Lundy contends the Partnership Agreement's dissolution provision still governs.[4]

*O'Donnell v. McLoughlin,* 386 Pa. 187, 125 A.2d 370 (1956), addressed the power of a court to disregard the dissolution provisions of a Partnership Agreement. In *O'Donnell* the chancellor found that each of the partners had breached the Partnership Agreement and ordered the partnership dissolved. *Id.* at 371–72. The Partnership Agreement contained a dissolution provision stating:

> The good will of the business shall not be considered a part of the capital effects of the partnership and shall not be sold, but each partner shall be at liberty

to commence and carry on similar business in his own or other name not similar or identical with the name of the firm.

*Id.* at 372. The chancellor found the agreement's dissolution provision inapplicable because of the partners' breaches and ordered the partnership sold to the partner bidding highest for it. *See id.*

On appeal, the Pennsylvania Supreme Court held the chancellor had no authority to disregard the Partnership Agreement's dissolution provision. The court found that "[t]he articles did not forthwith become a nullity merely because both partners were guilty of violations of them." *Id.* at 373. Unless extraordinary circumstances justify the avoidance of the dissolution provision, its terms govern the partnership's dissolution. "In the absence of [fraud,] a countervailing prohibition of law or the intervening rights of third persons, ... the terms are reasonable and just in themselves and continue[ ] to be the law of the partnership." *O'Donnell,* 125 A.2d at 373.

Here, there are no extraordinary circumstances justifying the avoidance of the dissolution provision of the Partnership

---

**2.** There are few differences between the two methods of dissolution, but the differences are significant in value. In a dissolution under the UPA, the open ML&L cases and the furniture and fixtures Lundy brought to the firm would be H&L property, divisible fifty-fifty between Haymond and Lundy after the partnerships debts are paid. Under the Agreement's dissolution provision these two items remain with Lundy with certain minimal exceptions. In a dissolution under the UPA, the H&L cases' net fees would be treated as liquidated partnership assets, divisible fifty-fifty between Haymond and Lundy after the partnerships debts are paid. Under the Partnership Agreement the division of these profits favors Lundy.

**3.** Haymond sought "a declaration ... that defendant Lundy is obligated to comply with

the terms of and conditions of the Partnership Agreement and, as to the dissolution of the partnership, particularly the provisions of Article 9." Compl.¶ 28. The complaint also stated, "Haymond has performed and remains ready, willing and able to perform all of his duties and responsibilities pursuant to the Partnership Agreement." Compl. ¶ 15.

**4.** After receiving Haymond's memorandum on appropriate injunctive relief, Lundy filed a motion for a mistrial claiming that the jury was influenced by Haymond's argument that he only wanted to enforce the Partnership Agreement. The court denied the motion as untimely without prejudice to Lundy's renewing the motion upon an entry of judgment by the court.

Agreement. There was no fraud in the formation of the Haymond & Lundy partnership. This court dismissed Lundy's fraud claims because Lundy knew of Hochberg's indictment for bank fraud and could not have reasonably relied on assertions that the indictment would not affect the partnership, *see Haymond v. Lundy*, No. 99–5015 & 99–5048, 2000 WL 804432, 2000 U.S. Dist. LEXIS 8585 (E.D. Pa. June 22, 2000), and Haymond has never alleged fraud. There is no assertion that a third party has intervening rights, and neither party has alleged that the dissolution provision violates law or public policy. Under *O'Donnell*, this court has no authority to disregard the dissolution provisions of the Haymond & Lundy Partnership Agreement.

Haymond argues *O'Donnell* is distinguishable because it did not address a finding of material breach and it is the materiality of the breach that mandates cancellation of the contract.[5] Finding a breach material is the equivalent of finding the breaching party did not substantially perform his or her duties under the contract. This failure to perform justifies the non-breaching party's subsequent decision not to perform, i.e., where one party has previously materially breached the contract, the second party cannot be held liable for a later breach of the agreement.

While the *O'Donnell* court did not invoke the term "material," it accepted the chancellor's finding that the breaches were persistent and severe, and justified the termination of the partnership. The termination of the partnership cancels the partnership agreement; the purpose of the agreement is the formation and governance of the partnership. The *O'Donnell* court held that this cancellation of the partnership contract did not affect the applicability of its dissolution provision.

Haymond also argues that *O'Donnell* is distinguishable because it addressed a situation in which both partners had breached the Partnership Agreement, so equity did not favor either partner. Here, Lundy is the only partner found to have breached the Partnership Agreement. According to Haymond, dissolving the partnership under the terms of the Partnership Agreement is inequitable because it fails to punish, and, in fact, rewards Lundy for having breached the agreement.

Dissolving the partnership according to the Partnership Agreement terms will not punish Lundy, but punishment is not the appropriate remedy for a contract violation. Contract damages are compensatory, not punitive in nature. *See Johnson v. Hyundai Motor America*, 698 A.2d 631, 639 (Pa. Super Ct.1997); J. Calamari & J. Perillo, The Law of Contracts § 14.3–14.4, at 542–544 (4th ed. 1998)("The relief

---

**5.** Haymond asserts that this court previously stated a material breach would cancel the dissolution provision of the contract. He refers to the court's statement "were a jury to find that Haymond materially breached the contract ..., Lundy would no longer be obligated to abide by the dissolution provisions." This statement was made in connection with this court's ruling that Haymond was not entitled to summary judgment on his claim concerning Lundy's solicitation of clients post-dissolution. Lundy claimed that Haymond had materially breached the contract previously. The court intended the statement

to mean simply that if the jury found Haymond breached the agreement first, Haymond might not be entitled to collect damages for Lundy's subsequent breach.

The interaction of the issue of materiality with the existence of a contractual provision addressing dissolution is a complicated matter and not one often addressed by the courts. The court's language may have been imprecise, but a more complete review of this issue leads the court to conclude that the material breach of the Partnership Agreement by Lundy does not void the dissolution provision of the Partnership Agreement.

should place the non-breaching party in the position he or she would have occupied had the breach not occurred.").

Dissolution under the terms of the Partnership Agreement also does not reward Lundy for materially breaching the Partnership Agreement; he will receive nothing more than he would have received had he not breached. Haymond presumably brought this action because he believed Lundy was attempting to get *more* than he would have received under the Partnership Agreement, and leave Haymond less. The jury's verdict entitles Haymond to everything to which he was entitled under the Partnership Agreement, i.e., Lundy will not receive more. *See* Calamari & Perillo, § 14.4 at 543. It does not entitle Haymond to ignore the dissolution terms and seek to place himself in a better position than he would have been in absent Lundy's breaches.[6]

The jury's finding that Lundy breached the agreement mandates that the partnership be dissolved under the conditions that would have existed had Lundy not breached the Agreement and in accordance with the Agreement's dissolution provision. Any benefit Lundy received from breaching the Partnership Agreement must be rescinded. Appropriate injunctive relief is determined by examining dissolution under the Partnership Agreement and addressing each breach found by the jury and how it effects those terms.

## II. Dissolution Under the Partnership Agreement

Article 9 of the Partnership Agreement contains the partners' plan for dissolution.

The partners disagree on the meaning of several terms in this provision.

### A. The Legal Standard:

■ "The paramount goal of contract interpretation is to ascertain and give effect to the parties' intent." *Tuthill v. Tuthill*, 763 A.2d 417, 419 (Pa.Super.Ct.2000). To determine intent one looks first to the contract. *See id.* "Each and every part of the contract must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument." *Id.* Where the intention of the parties is clear and unequivocal from the contract, this intention governs and must be given effect. *See Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638, 642 (1993).

■ A contractual term is clear if it is capable of only one reasonable or fair interpretation without reference to matters outside the contract. *See id.* A term is "not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." *Duquesne Light Co. v. Westinghouse Electric Corp.*, 66 F.3d 604, 614 (3d Cir.1995) (citations omitted). A party may introduce extrinsic evidence to show that a provision of the contract is ambiguous, but that evidence must show "the parties' linguistic reference," not merely the parties' subjective expectations. *Id.* If the court then determines the contract's term is ambiguous or susceptible to more than one reasonable interpretation, the court may then look outside the four corners of document to extrinsic evidence to determine the parties' intent. *See*

6. Haymond's assertion that the dissolution provision of the Uniform Partnership Act ("UPA") must govern upon a finding of a material breach is also demonstrated to be incorrect by considering the impact of this holding had the jury found that Haymond, rather than Lundy, materially breached the Partnership Agreement. Lundy would receive less because of Haymond's material breach; the dissolution provision of the UPA would entitle him to less than he was entitled to under the dissolution provision of the Partnership Agreement. *See supra*, n. 2.

*Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 476 A.2d 1, 5 (1984).

## B. Liquidation of Partnership Assets:

The Partnership Agreement provides that, with two exceptions, "the assets of the Partnership shall be liquidated" and distributed in the order provided in the Agreement. *See* Partnership Agreement, § 9.02(e). The two exceptions are: (1) the open cases, which will be addressed below; and (2) the furniture, fixtures and equipment contributed to the partnership by Lundy under section 3.02(b)(ii) of the Partnership Agreement, which must be returned to Lundy. *See* Partnership Agreement, § 9.02(f).

The liquidation of the other assets of the partnership will take place as described in the Agreement.[7] The partners may bid on or purchase any asset in accordance with § 9.02(d). The proceeds from the liquidation will be added to the funds in the partnership accounts; the total will constitute the partnership's capital for distribution.

## C. Distribution of the Firm's Capital:

■ The firm's capital must first be used to pay the outstanding debts the partnership owes to third parties. *See* Partnership Agreement, § 9.02(a). Partnership debts include the bank debt, and,

because Hochberg is no longer a partner, the money he loaned the partnership.

Despite its dissolution, H&L also continues to incur debts to third parties. For example, the firm is a defendant in an ongoing lawsuit captioned *Tupper v. Haymond & Lundy, LLP.* The attorney's fees and costs of this litigation continue to accrue. In order to ensure this and other debts of the partnership that continue to accrue will be paid, the amount of $500,-000 [8] shall be set aside to cover these debts before any partnership capital is distributed to either Haymond or Lundy.

If any capital remains after the debts of the partnership are provided for, those funds will be distributed to the partners. First, the partnership shall pay Haymond the balance of his capital account. *See* Partnership Agreement, § 9.02(a)(i). Next, the partnership must repay any loans or advances made by the partners. *See* Partnership Agreement, § 9.02(a)(ii).

According to the testimony of David Easterly, each of the partners made cash loans to the partnership. *See* Trial Tr., Jan. 22, 2001, at 151–53. Lundy's cash loans to the partnership totaled $325,000, and Haymond's totaled $275,000.

In addition, the Partnership Agreement acknowledges that "Lundy has incurred expenses in connection with the Lundy Cases" which shall be deemed a loan to the partnership. *See* Partnership Agreement,

---

**7.** In the last few weeks, the parties have written letters to each other concerning certain items purchased on behalf of Haymond & Lundy, LLP without the approval of every partner. Such purchasing decisions are not partnership decisions, so they are not governed by unanimous consent rule in Partnership Agreement § 5.01. The debated items, including a Ford Taurus and a coffee table, must be liquidated as assets of H&L, and the proceeds of the liquidation will be disbursed in accordance with the Partnership Agreement. It is incontestable that these and all

other assets of the partnership should be sold for as high a price as possible, and not for an unreasonably low price. For example, the liquidator should make reasonable efforts to sell the Ford Taurus for a price equal to or greater than its blue-book value.

**8.** The court believes this amount is sufficient to cover the accruing debts of the partnership, including the rent on the offices of Haymond & Lundy for the duration of the partners' private guarantees under the firm's leases.

§ 3.06(b). Between July 29, 1997, the date Lundy's former firm, ML&L, dissolved, and the formation of H&L in October, 1997, Lundy expended money to continue litigating the cases he received from ML&L post-dissolution (the "Lundy Case Expenses" in the Partnership Agreement). For the first two years of the partnership, when Haymond & Lundy collected fees from any of the cases for which Lundy personally incurred costs, Lundy was not reimbursed; the amount was deemed loaned to the partnership. *See id.* The partnership was to repay these loans in installments beginning the twenty-fifth month of the partnership, *see id.*, but the partnership was dissolved before the twenty-fifth month and Lundy was never repaid. The Lundy loan must be repaid with the cash loans made by the partners.[9]

If there are insufficient funds for the partnership to repay the total amounts loaned to the partnership by the partners, the remaining partnership funds must be disbursed to Haymond and Lundy in proportion to the amount each is owed.[10] *See* Partnership Agreement § 9.02(a)(ii). If the partnership capital is sufficient to pay the partner loans in their entirety, any funds remaining must be disbursed to the partners in accordance with their percentage interests in the partnership, i.e., half to Haymond and half to Lundy. *See* Partnership Agreement § 9.02(a)(iii).

### 1. Lundy's Breach of § 3.02

■ At trial, Haymond argued Lundy delayed resolution of the ML&L arbitration and the distribution of the ML&L fees until after he dissolved H&L, contrary to the best interests of the partnership, so that he, not the partnership, would receive the fees. The evidence of the breach included the testimony of Haymond and Lundy, and correspondence between Haymond, Lundy and Hochberg.

In late August, 1999, Haymond wrote to Donald Marino, an H&L attorney representing Lundy in the arbitration against Manchel. The memorandum stated:

> Judge Katz has indicated his readiness to rule on a formula for division of the monies between Donald Manchel and Haymond & Lundy. Since the fee portion of any distribution has been assigned to the Haymond & Lundy Law Firm, you are hereby instructed on my behalf to contact Judge Katz and request his ruling immediately.

P.Ex. 34. Haymond testified that he made the request because the firm needed the cash for operating expenses. *See* Trial Tr., Jan. 17, 2001, at 94–113; *see also,* P.Ex. 35. Lundy confirmed that at the end of September the firm faced a shortfall of $121,000. *See* Trial Tr., Jan. 19, 2001, at 135.

Hochberg wrote Lundy by memorandum dated September 27, 1999 that the

---

**9.** According to David Easterly, the total amount due on the Lundy Loan on the date of dissolution was $672,095. If either party contests this amount, Lundy shall provide a detailed statement of litigation expenses he incurred for each ML&L case prior to H&L assuming the payment of expenses and an accounting of which cases were settled or litigated to judgment during the term of the partnership. The total amount advanced by Lundy and recouped by H&L prior to dissolution is the amount Lundy is due under Partnership Agreement § 3.06(b).

**10.** If David Easterly was correct about the amount due on the Lundy loan under Partnership Agreement § 3.06(b), Lundy is owed a total of $997,095.00 and Haymond is owed a total of $275,000. If the remaining partnership capital is insufficient to repay these amounts in total, the capital available should be divided proportionately based on comparative amount owed, or 78% to Lundy and 22% to Haymond.

advertising budget would be affected by the monetary problems facing the firm. P.Ex. 36. In that memo, Hochberg stated: "[i]f you [Lundy] had not unilaterally decided to postpone the receipt of ML&L funds due to Haymond & Lundy the current cash problem would not exist." P.Ex. 36. Lundy responded to Hochberg's allegation of delay by letter dated September 28, 1999:

> I could not reach an agreement with Don on this issue, and, as it turned out, I did not want to reach an agreement because Don is running short of money and I believe this is the best way to make him settle matters in a manner favorable to me.

P.Ex. 37.

In his testimony, Lundy clarified that in late-September Manchel had offered to split the accumulated money equally with him. *See* Trial Tr. Jan. 19, 2001, at 137. Lundy refused to agree to an equal division, *see id.;* it was for that reason he and Manchel "could not reach an agreement." P.Ex. 37; *see id.* Haymond argued to the jury that Lundy's failure to accept the Manchel's settlement offer, equally divide the money, and solve the firm's financial problems violated his duty under Partnership Agreement § 3.02 to use his best efforts to obtain as large a percentage of the ML&L fees as possible for the benefit of the partnership. *See* Trial Tr. Jan. 25, 2001, at 72–73. The jury found that Lundy breached Partnership Agreement § 3.02.

Despite the jury's finding, Lundy argues that none of the ML&L money should be returned to H&L because Haymond did not prove that, absent Lundy's actions, money would have been distributed to the firm. Lundy notes that "any agreement with Mr. Manchel would have required that each agree to not only the amount of the distribution but also to the percentage distribution each would receive." L. Brief on Appropriate Relief, at 23. According to Lundy, "[t]here is no evidence whatsoever from which one can. speculate as to the sum of money, if any, which Manchel and Lundy would have agreed was appropriate." *Id.*

Lundy's testimony demonstrated that Manchel offered to settle the matter by an equal division of the money in September. The evidence of Manchel's offer is sufficient to show the minimum the partnership would have received had Lundy acted in the partnership's best interest, in accordance with his duty under § 3.02. To remedy this breach, Lundy must cause fifty percent of the ML&L money available in the arbitration escrow account on the date of dissolution to be transferred to the H&L account;[11] it is partnership capital for the purposes of dissolution.[12] The parties stipulated that on October 8, 1999, the sum of $1,765,918.55 was in the ML&L arbitration escrow account. Half of that amount, or $882,959.28, must be made part of H&L's capital for division in the manner discussed above.[13]

---

**11.** In November, 1999, Lundy was awarded 55% of the ML&L funds, or $971,255.20 of the $1,765,918.55 in the account on the date of dissolution.

**12.** The date of dissolution applies, rather than the date of the offered settlement because had Lundy settled the arbitration dispute, all ML&L funds received thereafter could have immediately been divided and disbursed. Lundy's portion of those funds would have

been paid to Haymond & Lundy, LLP through the date of dissolution.

**13.** At various points during this litigation, Haymond has contended that Lundy and Manchel retained funds that should have been placed in the ML&L escrow account. Haymond argued that because H&L is owed a portion of those funds, it should be entitled to discovery on the amount withheld and the return of those funds from Manchel and Lun-

## 2. Other Capital Adjustments

### a) The Easterly Adjustment

■ Haymond owes the partnership $17,246.00 for services rendered by David Easterly for the benefit of his new firm, Haymond Napoli Diamond, P.C., while Easterly's salary was paid in full by Haymond & Lundy, LLP. *See* Order, May, 17, 2001. To accomplish the dissolution calculations correctly, this money must be repaid and included in the partnership capital for distribution.

### b) The Request for a Rent Adjustment

■ Haymond's new Philadelphia firm, HND–PA, claims Lundy's new firm, The Law Offices of Marvin Lundy ("LOML"), inequitably occupies more than one-half the office space formerly occupied by Haymond & Lundy, LLP and should have to reimburse a portion of the rent paid on the property since the date of dissolution.[14]

Haymond & Lundy, LLP relocated to the space at issue, the 19th floor of Seven Penn Center, in January, 1999. The lease began in November, 1998 and expires on October 31, 2009, although there is an early termination provision which, if exercised, would end the lease on January 31, 2006.

Haymond, Lundy and Hochberg signed a limited guaranty and suretyship agreement stating they would be jointly and severally liable for the firm's obligations under the lease for the first forty-eight months. These personal guarantees do not expire until at least the end of November, 2001. For these reasons, the parties agreed that Haymond & Lundy, LLP should continue to pay the rent post-dissolution, and, in the event that H&L could not pay the rent, Haymond and Lundy would divide the rent obligation equally.

Upon the dissolution of H&L in October, 1999, Haymond and Lundy each formed new law firms. The newly formed law firms began to operate within the space leased to H&L.[15] On the occasions when H&L could not pay the lease, the new law firms, rather than the former partners of H&L, have each paid half the rent. *See* Mtn. for Payment of Rental for Excess Space, at 2. This has occurred twice since the dissolution of H&L. *See id.*

HND–PA now claims that Lundy's firm, LOML, should have to reimburse H&L and HND–PA for a portion of the rent paid because LOML occupies more than half the space leased by H&L. Specifically, HND–PA moves that the court order LOML to reimburse: (1) H&L $119,342.89 constituting one-third of the rent paid by H&L since the dissolution; and (2) HND–PA $2,581.04, one-sixth of the rent it paid during the two months H&L was unable to fulfil its obligations under the lease.

HND–PA may not assert this claim in this action: it is not a party to this action, nor is LOML, the firm from which it de-

---

dy. It may be that Lundy and Manchel withheld funds from the account, but the arbitration account is within the jurisdiction of this court only to the extent of determining what percentage of those funds, if any, are H&L property. If H&L wishes to pursue the withheld funds further, it must do so in another forum.

**14.** The motion also asserts that the space division decisions made by Special Master Heller were inequitable, but Haymond did not timely request review of these decisions by the court.

**15.** The sharing of space by the two successor law firms has been a continual source of additional discord among the already hostile parties. The court has repeatedly urged the parties to negotiate a settlement with the landlord and find new, separate offices, or enter into separate leases for a divisible portion of the space at issue. Despite this urging, the two firms have shared this space throughout this contentious litigation; the pending motion suggests this arrangement has not become more amicable with time.

mands reimbursement. A non-party cannot move the court to order another non-party to do anything. The actions of these firms are properly before the court only because they are directed by the parties, who may have assigned them much of the H&L property in dispute, but this claim is not brought on behalf of Haymond, calling himself HND–PA. The motion is signed, not by Haymond's attorney, but by the attorney for HND–CT. HND–CT is a separate corporate entity from HND–PA and does not occupy any portion of the space at issue.

Assuming *arguendo* the court could address the portion of the motion requesting reimbursement of H&L, the court would deny the motion. The lease between H&L and the Arden Group obligates H&L to pay the rent for the 19th floor of Seven Penn Center no matter how the space is divided, or whether it is occupied at all.[16] H&L has not assigned its rights to the space or sublet it to LOML and HND–PA, nor could it under its lease. The court will not order Lundy, or his new law firm, to reimburse H&L or HND–PA for past rent.

When the dissolution of Haymond & Lundy is completed, the tenant on the lease will no longer exist. The new firms will be required to relocate or negotiate a new lease for this space with the landlord, at which time issues of payment and space division may be reconsidered by the new tenants.

### D. Division of the Cases:

Section 9.02(e) of the Partnership Agreement governs the division of open cases upon dissolution of the partnership.

The cases that originated at H&L are treated distinctly from those brought to H&L from ML&L by Lundy upon the formation of the firm (the "ML&L cases").

### 1. The Haymond & Lundy Cases:

■ The H&L cases are the cases that originated at Haymond & Lundy, LLP, i.e., the client came to H&L during the term of the partnership. As to these cases, the Partnership Agreement provides:

[I]f ... dissolution occurs prior to the third anniversary of the commencement of the Partnership, Lundy shall receive from the Partnership two-thirds of such cases and Haymond and Hochberg together shall receive from the Partnership one-third of such cases, the specific manner of such allocation to be agreed upon in good faith by the parties ... *provided, however,* that the net fee recoveries from all such cases other than the Lundy Cases shall be divided 80/20 such that 80% of the net free recoveries shall be retained by the Partner handling the matter and the remaining 20% shall be paid to the Partner(s) not handling the matter.

Partnership Agreement, § 9.02(e)(i)(B). The division of cases did not take place by agreement of the parties. The jury found that Lundy breached this provision by refusing to meet with Haymond to divide the cases and/or by soliciting H&L clients.

After commencement of the litigation, the court ordered the parties to cease communications with all clients of the dissolved firm. The special master sent letters to

---

**16.** The parties decision to divide rent obligation equally was logical under the terms of their lease guaranty. The guaranty makes the former partners of H&L jointly and severally liable for the rent, should H&L default. Moreover, under Pennsylvania law, the part-ners are jointly liable for the debts and outstanding obligations of a dissolved partnership, *see* 15 Pa. Cons.Stat. Ann. 8327(2). At the time of dissolution, Haymond and Lundy each held a fifty percent interest in H&L.

these clients,[17] and much of the case division took place by client choice. Such choices must not be disturbed. *See Hiscott & Robinson v. King*, 426 Pa.Super. 338, 626 A.2d 1235, 1237 (1993)(client has absolute right to fire an attorney and select new counsel); M. Epstein & B. Wisoff, *Winding Up Dissolved Law Partnerships: The No–Compensation Rule and Client Choice*, 73 Calif. L.Rev. 1597, 1603–1604 (1985).

Approximately twenty months have passed since the dissolution and the division of the cases. During that time, the attorneys who received the case post-dissolution have worked with the clients. Litigation of the cases has progressed, and many have reached final resolution. The parties generally agree that it is not feasible for the court to redistribute the cases now.[18] For these reasons the court finds it inappropriate to attempt a re-distribution of the cases.

Had § 9.02(e) been followed upon dissolution, the potential value of the H&L cases would have been estimated; Lundy would have received two-thirds and Haymond would have received one-third of those cases by estimated potential value.[19] Then, after the cases were closed by settlement or verdict, the costs of litigation would be repaid and the net fees earned would be apportioned. The partner's firm handling the case would keep 80% of the net fee recovery and send the other partner's firm 20%.

Assuming (1) the initial division based on potential value had occurred perfectly, i.e., the parties had estimated the potential value of each case correctly and potential value equaled actual value, and (2) the total value of all the H&L cases was

17. On November 10, 1999, approximately one month after the dissolution, Mr. Heller sent a letter to all the clients of Haymond & Lundy, LLP whose cases remained open at the time of dissolution. It stated:

> I am the Court-appointed neutral representative of the dissolved law firm of Haymond & Lundy. Two groups of lawyers from the firm have filed lawsuits against each other ... Prior to my appointment as neutral representative, you may have received letter from Haymond & Lundy attorneys regarding representation in your case. Regardless of any statements made by any attorney regarding the events which led to the dissolution, your choice will govern the selection of attorney representing you. If you have responded to any of these letters, your selection will be followed. If you have not responded to the earlier letters, please do not do so. In the near future, you will be advised if there is any recommended change in the attorney who will be assigned to your case. You always have the right to select or change to counsel of your choice. You will, of course, have that opportunity if you are not satisfied with the attorney who will be assigned.

After this letter was sent, the Special Master worked with the parties to reach agreements about the division of remainder of the cases in which the parties did not affirmatively choose counsel.

18. In his brief on appropriate relief, Lundy states "[a]t this point, with many cases having been settled, it is difficult to adhere to the strict letter of this section." Similarly, Haymond stated "[d]ue to Mr. Lundy's ... soliciting all of the clients of H&L, and the passage of sixteen months since the dissolution took effect, it would be impossible to recreate the result that would have pertained absent the breach," i.e., the meeting to divide the cases by potential value and agreement.

19. The Partnership Agreement does not define the term potential value. The court finds the term as used in the Partnership Agreement means potential profit or potential net fee recovery. To measure a case's potential value in this sense, the partners would have had to estimate the chances of winning or successfully settling the suit, approximate the potential recovery on the claim and the costs of litigation. The result would be an estimate of the case's value, also described in the Partnership Agreement as the net fee recovery.

$3,000,000,[20] initially Lundy would have received $2,000,000 worth of cases and Haymond would have received $1,000,000. Upon resolution of the cases, Lundy would have transferred 20% of the net fees or actual value recovered for him portion of the cases to Haymond ($400,000). Haymond would similarly have transferred 20% of the actual value or net fees recovered by him on his one-third share of the cases ($200,000) to Lundy. After these transfers, Lundy would have received $1,800,000 in net fees from the H&L cases. Lundy's $1,800,000 represents 60% of the original $3,000,000 total value. Haymond would have had $1,200,000, or 40%, of the original $3,000,000 total value. If, upon resolution of any H&L case, 40% of the net fees recovered are paid to Haymond and 60% of the net fees recovered are paid to Lundy, the parties' intentions for the division of the H&L cases can be given full effect without having to re-divide the cases.[21]

## 2. The ML&L Cases:

The ML&L cases were those cases brought to H&L by Lundy from his former firm, Manchel, Lessin & Lundy, LLP. As to the ML&L cases, the Partnership Agreement states that upon dissolution "Lundy shall receive from the Partnership all right, title and interest in and to the Lundy cases." Partnership Agreement § 9.02(e)(i)(A).

### a) ML&L Cases Open at the Time of Dissolution

The plain language of this provision requires that, upon dissolution, Lundy should receive all the cases he brought to H&L from ML&L that remain open, unless the client chooses another attorney. *See Hiscott,* 626 A.2d at 1237; Partnership Agreement § 9.02(e)(ii)(acknowledging the client's absolute right to choose counsel). Under this provision, Lundy is entitled to retain 100% of the net fees recovered from ML&L cases handled by his new firm post-dissolution.

Certain ML&L cases are being handled by Haymond's new firm, Haymond Napoli Diamond, P.C.-PA ("HND–PA"). At trial, Lundy alleged that Haymond acquired these cases for HND–PA through solicitation in violation of the Partnership Agreement. The jury found that Haymond did not breach the contract in this regard, so the court must assume that those ML&L cases are being handled by Haymond's new firm as a result of client choice.

Despite the jury finding, Lundy contends that these cases should be transferred back to Lundy or, in the alternative, that the court should require Haymond to disgorge the profits. According to Lundy, he "should receive 80% of the fee on settlement or other disposition with 20% going to HND, and HND bearing the costs." There is no basis for Lundy's request in the Partnership Agreement.

Section 9.02(e)(ii) of the Partnership Agreement provides: "[i]n *any* circumstance in which ... a client selects the Partners other than the Partner to whom his case was allocated ... the lawyer selected by the client may take the case and

---

**20.** This figure was chosen for demonstration purposes only. The percentage based results reached would remain the same regardless of the figure selected for total value.

**21.** The court has considered Haymond's concern that requiring the parties to divide the net fees recovered from each H&L case will prolong their relationship with one another and could create contradictory incentives. Partners who are winding up partnership business do so as fiduciaries for the benefit of the dissolved partnership. *See In Re Labrum & Doak, LLP,* 227 B.R. 391, 408 (Bankr. E.D.Pa.1998); *see also* 59A Am.Jur.2d 672–73.

pay to the other [partner] ... 20% of the net fee recovery from that case." This provision applies to ML&L cases handled by Haymond's new firm, HND–PA post-dissolution. Upon receipt of the fees from any such case, Haymond, or his firm, must transfer 20% of the net fees recovered to Lundy.

### b. Lundy's Claim to the Net Fees from the ML&L Cases Closed Prior to Dissolution:

■ Between the formation of H&L in October, 1997 and its dissolution in October, 1999, many of the ML&L cases brought to H&L by Lundy were settled or tried to verdict. The fees from those cases were paid to H&L. According to Lundy, H&L received a total of $6,141,000 in net fees from ML&L cases closed prior to dissolution. Lundy claims he is entitled to the return of those fees upon dissolution under Partnership Agreement § 9.02(e).

Under Partnership Agreement § 3.02(b) the ML&L cases were part of Lundy's capital contribution to H&L. He was to "transfer [them] or cause [them] to be transferred to the Partnership." Partnership Agreement, § 3.02(b). Lundy accomplished this transfer by permitting H&L to handle the ML&L cases.

Partnership Agreement § 3.05 states that "[e]xcept as specifically provided in this Agreement, no partner shall be entitled to demand or receive a return of his capital contribution." The dissolution provision of the Agreement does not specifically address the fees recovered by H&L from settling or successfully trying ML&L cases to verdict during the term of the partnership.

Lundy contends these fees are governed by the general statement in § 9.02(e) that Lundy "shall receive all right, title and interest in and to the Lundy cases." Lundy argues that the use of the term "Lundy cases" in § 9.02(e) is dispositive because

that term is defined in Partnership Agreement § 3.02(a) to include all ML&L cases, not merely those open at the time of dissolution. The court must look to the contract as a whole to determine whether Lundy's interpretation is reasonable. *See Tuthill*, 763 A.2d at 419. Lundy's interpretation requires the court to find that § 9.02(e) of the Agreement applies not only to cases open at the time of dissolution, but to the fees from cases which were closed prior to the date of dissolution. This interpretation is inconsistent with Lundy's own interpretation of § 9.02(e) as it applies to the H&L cases and the ML&L fees at issue in the arbitration between Manchel and Lundy.

Were the court to read § 9.02(e) to govern the fees H&L acquired from closed cases, the fees from H&L cases closed prior to dissolution would have to be divided in accordance with § 9.02(e)(ii) also. Yet, Lundy has never claimed he is entitled to two-thirds of the net fees received by H&L from H&L cases settled or tried to verdict prior to dissolution under § 9.02(e).

Similarly, under Lundy's reasoning, § 9.02(e) would also apply to the fees at issue in the ML&L arbitration. Those fees were also to be assigned to the partnership as part of Lundy's capital contribution and defined as part of the "Lundy cases" under § 3.02(a). Under Lundy's reading of § 9.02(e), any ML&L arbitration fees distributed to the partnership during its term would have to be returned to Lundy upon dissolution. Yet, Lundy has never claimed that any distribution of the ML&L fees in the arbitration escrow made during the term of the partnership had be returned to him under § 9.02(e). He fought vigorously against Haymond's claim that ML&L arbitration fees should have been disbursed prior to the dissolu-

tion because he understood that, if those fees had been distributed during the term of the partnership, the fees would have remained part of H&L's capital under the Agreement. Lundy has tacitly acknowledged that Partnership Agreement § 9.02(e) addresses only the distribution of cases open on the date of the dissolution of H&L.

The court finds that the only reasonable interpretation of § 9.02(e) is that the section applies to cases open at the time of dissolution. Lundy is not entitled under that provision to the return of any of the fees received by H&L during the term of the partnership for settling or litigating ML&L cases to verdict.

### 3. Adjustments to Case Entitlements

At a hearing on December 13, 2000, the court heard argument on cross-motions for contempt. Each party alleged the other had contacted a client for the purpose of attempting to influence the client's choice of counsel in violation of orders of this court. The court found both parties in contempt by clear and convincing evidence. *See* Order, Dec. 14, 2000.

Lundy alleged Haymond's staff attempted to coerce a client named Marlo Jones to choose HND–PA to represent him. Haymond's staff failed in this effort, and Jones continues to be represented by Lundy's new firm. As a sanction against Haymond, the court held that the case of Marlo Jones, which originated at H&L, would be treated as an ML&L case for the purposes of dissolution, rather than a H&L case. *See* Order, Dec. 14, 2000. The fees received from the representation of Jones shall be retained completely by Lundy. *See supra* Section II(D)(2)(a).

Haymond alleged Lundy attempted to coerce a client named Ron Hammock to choose his new firm to represent him. Lundy failed at this effort, and Hammock continues to be represented by HND–PA. As a sanction against Lundy for improperly communicating with Ron Hammock, the court ordered that Hammock's case be treated as an H&L case rather than an ML&L case. Hammock's case was originally brought by Lundy to H&L after the dissolution of ML&L. After the dissolution of H&L, Hammock affirmatively chose an attorney who joined HND–PA as his counsel.

Upon comprehensive examination of the provisions governing dissolution of the H&L partnership, the court must acknowledge that treating the matter as an H&L case will reward, rather than sanction Lundy. Treating Hammock's case as an H&L matter will entitle Lundy to 60% of the fees, *see supra* Section II(D)(1), rather than entitling him to 20% of the fees were the case treated as an ML&L case in which the client chose an HND attorney. *See supra* Section II(D)(2)(a). Therefore, the court finds the sanction it awarded by Order dated December 14, 2000 inappropriate. Hammock's action will be treated as if it originated at HND–PA; HND–PA will be entitled to retain all fees derived therefrom.

### III. The Appointment of a Receiver:

The Partnership Agreement does not specifically provide for who shall oversee the liquidation of the partnership assets and the disbursement of H&L funds. Section 9.02(d) of the Partnership Agreement appears to assume that either the partners will agree to perform the required tasks jointly or a liquidator will be appointed. The provision states: "the Partners or the liquidator, as the case may be, shall determine" how to proceed with liquidation. Partnership Agreement, § 9.02(d).

 Courts have an inherent equitable power to appoint a receiver to over-

see the dissolution of a partnership. This power must be "exercised sparingly, with caution and circumspection, and only in an extreme case under extraordinary circumstances." *Tate v. Philadelphia Transportation Co.,* 410 Pa. 490, 190 A.2d 316, 321 (1963).

Haymond contends there are no grounds for appointment of a receiver and seeks to be appointed liquidating partner. Citing *Hankin v. Hankin,* 279 Pa.Super. 179, 420 A.2d 1090 (1980), Haymond asserts that there must be evidence of waste, risk of dissipation of assets, fraud or mismanagement before a court may appoint a receiver. The *Hankin* decision cited by Haymond was overturned by the Pennsylvania Supreme Court, which held that the circumstances listed by the Superior Court are not the exclusive justifications for appointing a receiver. *Hankin v. Hankin,* 507 Pa. 603, 493 A.2d 675, 677 (1985). The Pennsylvania Supreme Court held that "trial courts, sitting in equity, [are] vested with wide discretion when partnership liquidation cases are brought before them and are primarily responsible for determining whether a receiver is required." *Id.*

The history of this action demonstrates the impossibility of joint dissolution by the former partners of H&L or one partner performing this task. The parties and their counsel have repeatedly demonstrated their acrimony toward and distrust of one another. This litigation has surpassed adversarial and is more accurately described as bellicose.

This court has addressed no less than eight motions for contempt thusfar. In those motions, each of the parties has alleged that the other has failed to follow the procedures established by the court and/or the special master for ensuring that the partnership property is protected and maintained until the court's decision on the manner of dissolution. *See, e.g.,* Haymond's Mtn. to Hold Alan Epstein in Contempt & Response (containing cross-allegations that attorneys failed to properly escrow funds). Were the court to appoint one partner to oversee dissolution, innumerable such situations would inevitably arise.

The appointment of a neutral receiver will not work an irreparable injury to the rights and interest of the parties. *See Hankin,* 493 A.2d at 678. Greater injury would more likely result from the failure to appoint a neutral. The court finds substantial evidence to support the appointment of a receiver.

The Special Master, Martin Heller, Esq., has worked with the parties since his appointment in November, 1999. He has developed an extensive background in the H&L partnership and has proved to work well with the parties. He has facilitated numerous agreements between the parties, including settling disputes concerning files and the operation of the common office space. The court believes it a logical extension of his current role to serve as Receiver.

As Receiver, Mr. Heller will have the authority to seek assistance from an accountant or other professionals as he believes necessary to complete the dissolution of the partnership in accordance with the terms of the Partnership Agreement. For work done as Receiver, in connection with the dissolution, he shall be paid from H&L assets.[22]

---

**22.** Payment of the Receiver will be a future accruing debt of the Partnership. If he shall need to be paid after the disbursement of funds to the former partners of H&L, the funds the court directed be set aside for the payment of such debts may be used to pay the Receiver.

## Conclusion

The H&L partnership shall be dissolved in accordance with the dissolution provision of the Partnership Agreement. The breach of Partnership Agreement § 3.02(a) shall be resolved by treating fifty percent of the ML&L funds present in the escrow account on the date of dissolution as an asset of the H&L partnership. The breach of Partnership Agreement § 9.02(e) shall be remedied by dividing the net fee recovery for each case originating at Haymond & Lundy so that Lundy shall receive 60% and Haymond shall receive 40% with the exceptions stated herein.

Special Master, Martin Heller, Esq. will serve as Receiver and oversee the dissolution of Haymond & Lundy, LLP in accordance with the terms of the Partnership Agreement. Dissolution shall proceed as promptly as feasible. The court shall receive a monthly report on the progress of dissolution, and a final report upon its completion. An appropriate order follows.

### *ORDER*

AND NOW this 31st day of August, 2001, in consideration of the jury's liability verdict in favor of John Haymond on a breach of contract claim against Marvin Lundy, for the reasons stated in the foregoing memorandum, it is **ORDERED** that:

1. Judgment is entered in favor of John Haymond.

2. Martin Heller, Esq. is hereby appointed Receiver of Haymond & Lundy, LLP.

A. The Receiver shall, with the aid and cooperation of the parties, implement an orderly dissolution of Haymond & Lundy, LLP in accordance with Article 9 of the Partnership Agreement as interpreted by the foregoing memorandum of the court.

B. The Receiver shall be compensated for his work as receiver at a rate of *$250 per hour*. All reasonable expenses incurred by the Receiver in the course of the performance of his duties, including but not limited to long distance telephone, printing, travel, parking, data processing and postage, shall be reimbursed. The fees and expense of the Receiver shall be paid from the assets of Haymond & Lundy, LLP.

C. The Receiver shall have the power to seek the aid of an accountant, if he deems it necessary. The appointment of an accountant shall require the approval of the court. The Receiver is further empowered to use bank accounts in his representative capacity to hold sums in escrow for the payment of bills and distribution of profits to the parties.

D. The Receiver shall have access to all property, case files, books, records and facilities he deems necessary to perform the duties set forth herein. All communication with the Receiver, including files examined by him, shall be confidential and shall not constitute a waiver of attorney/client privilege.

E. The Receiver shall submit to the court and the parties a monthly report of hours and expenses incurred on this matter. The court will consider any objections submitted by the parties within five days of receiving the report.

F. The Receiver shall file a report on the first of each month concerning his activities, and shall file a final report prior to his discharge. These reports may be submitted without holding a formal hearing.

G. All activities of the Receiver are subject to the review and supervision of the court and may be revised, expanded or modified with notice to the parties.

H. The Receiver, as a court appointee, shall be held harmless from liability aris-

ing out of his activities in this matter. Any action against the Receiver may be taken only on application to this court.

I. The court may meet privately with the Receiver as necessary to facilitate a prompt and fair dissolution of Haymond & Lundy, LLP.

3. The Receiver shall proceed with the dissolution of Haymond & Lundy, LLP as follows:

A. Lundy shall cause to be contributed to Haymond & Lundy, LLP $882,959.28, representing 50% of the fees present in the ML&L arbitration escrow account on the date of Haymond & Lundy, LLP's dissolution.

B. Haymond shall contribute to Haymond & Lundy, LLP $17,246.00 for services rendered by David Easterly for the benefit of his new firm, Haymond Napoli Diamond, P.C., while Easterly's salary was paid in full by Haymond & Lundy, LLP.

C. The furniture and fixtures Marvin Lundy contributed to Haymond & Lundy, LLP shall be returned to Lundy.

D. Net fees received from any H&L case open at the time of dissolution shall be divided between the parties as follows: Lundy shall receive 60% of the net fees and Haymond shall receive 40%.

(i) The sole exception to this rule shall be the case of Marlo Jones. The fees from Jones' case shall be retained entirely by Lundy or his new firm.

(ii) Net fees accumulated during the pendency of this action and held in escrow by the parties in accordance with this court's orders may be distributed as soon as the amounts held in escrow are verified correct by the Receiver.

(iii) Additional net fees received from H&L cases by the parties shall be placed in escrow pending an approval of the amount and distribution by the Receiver.

E. Net fees received by Lundy, or his new firm, from ML&L cases settled or litigated to verdict shall remain the property of Lundy or his new firm.

F. Net fees received by Haymond, or his new firm, from ML&L cases settled or litigated to verdict shall be placed in escrow. These fees shall be distributed 80% to Haymond, or his new law firm, and 20% to Lundy, or his new law firm, with one exception. The fees from the case of Ron Hammock shall be retained entirely by Haymond, or his new firm. All such distributions shall be approved by the Receiver.

G. All assets of Haymond & Lundy not otherwise provided for shall be liquidated, and the proceeds shall be made part of the capital of Haymond & Lundy for distribution.

H. The capital of Haymond & Lundy shall be disbursed in the following manner and order:

(i) Debts owed by the partnership to third parties shall be paid, including the bank debt and the loan made to the partnership by Hochberg;

(ii) $500,000 shall be set aside for the payment third party debts the partnership continues to accrue;

(iii) The loans made to the partnership by Haymond and Lundy shall be repaid. If there are insufficient funds to repay these loans in full, the remaining funds shall be paid in proportion to the total amount owed each partner;

(iv) Any remaining partnership capital shall be to the partners in accordance with their percentage interests in the partnership: 50% to Haymond and 50% to Lundy.